U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

## UNITED STATES DISTRICT COURT
## STATE OF VERMONT

2023 JUN 29 PM 3: 04

CLERK

BY_____
DEPUTY CLERK

| | |
|---|---|
| ADDISON CENTRAL SCHOOL DISTRICT, )<br><br>AND )<br><br>ADDISON NORTHWEST SCHOOL DISTRICT, )<br><br>AND )<br><br>ALBURGH SCHOOL DISTRICT, )<br><br>AND )<br><br>BARRE UNIFIED UNION SCHOOL DISTRICT, )<br><br>AND )<br><br>BARSTOW UNIFIED UNION SCHOOL DISTRICT, )<br><br>AND )<br><br>BELLOWS FALLS UNION HIGH SCHOOL DISTRICT, )<br><br>AND )<br><br>BLUE MOUNTAIN UNION SCHOOL DISTRICT, )<br><br>AND )<br><br>BRIGHTON SCHOOL DISTRICT, )<br><br>AND )<br><br>BURR AND BURTON ACADEMY, )<br><br>AND )<br><br>CABOT SCHOOL DISTRICT, )<br><br>AND )| CASE NO. 2:23-CV-164<br><br>**JURY TRIAL DEMANDED** |

i

**AND** )
)
**CAMBRIDGE SCHOOL DISTRICT,** )
)
**AND** )
)
**CHAMPLAIN ISLANDS UNIFIED** )
**UNION SCHOOL DISTRICT,** )
)
**AND** )
)
**CHAMPLAIN VALLEY SCHOOL** )
**DISTRICT,** )
)
**AND** )
)
**CHARLESTON SCHOOL DISTRICT,** )
)
**AND** )
)
**COLCHESTER SCHOOL DISTRICT,** )
)
**AND** )
)
**COVENTRY SCHOOL DISTRICT,** )
)
**AND** )
)
**CRAFTSBURY SCHOOL DISTRICT,** )
)
**AND** )
)
**DANVILLE SCHOOL DISTRICT,** )
)
**AND** )
)
**DERBY SCHOOL DISTRICT,** )
)
**AND** )
)
**ECHO VALLEY COMMUNITY SCHOOL** )
**DISTRICT,** )
)
**AND** )
)
**ENOSBURGH-RICHFORD UNIFIED** )
**UNION SCHOOL DISTRICT,** )
)

**AND** )
)
**ESSEX WESTFORD EDUCATIONAL** )
**COMMUNITY UNIFIED UNION** )
**SCHOOL DISTRICT,** )
)
**AND** )
)
**FAIRFAX SCHOOL DISTRICT,** )
)
**AND** )
)
**FIRST BRANCH UNIFIED** )
**SCHOOL DISTRICT,** )
)
**AND** )
)
**FLETCHER SCHOOL DISTRICT,** )
)
**AND** )
)
**GEORGIA SCHOOL DISTRICT,** )
)
**AND** )
)
**GREEN MOUNTAIN UNIFIED** )
**SCHOOL DISTRICT,** )
)
**AND** )
)
**HALIFAX SCHOOL DISTRICT,** )
)
**AND** )
)
**HARTFORD SCHOOL DISTRICT,** )
)
**AND** )
)
**HARTLAND SCHOOL DISTRICT,** )
)
**AND** )
)
**HARWOOD UNIFIED UNION SCHOOL** )
**DISTRICT,** )
)
**AND** )
)
**HAZEN UNION SCHOOL DISTRICT,** )

iii

**AND**                                              )
                                                     )
**HOLLAND SCHOOL DISTRICT,**                         )
                                                     )
**AND**                                              )
                                                     )
**JAY-WESTFIELD JOINT ELEMENTARY**                   )
**SCHOOL DISTRICT,**                                 )
                                                     )
**AND**                                              )
                                                     )
**KINGDOM EAST SCHOOL DISTRICT,**                    )
                                                     )
**AND**                                              )
                                                     )
**LAKE REGION UNION ELEMENTARY-**                    )
**MIDDLE SCHOOL DISTRICT,**                          )
                                                     )
**AND**                                              )
                                                     )
**LAKE REGION UNION HIGH SCHOOL**                    )
**DISTRICT,**                                        )
                                                     )
**AND**                                              )
                                                     )
**LAMOILLE NORTH MODIFIED**                          )
**UNIFIED UNION SCHOOL DISTRICT,**                   )
                                                     )
**AND**                                              )
                                                     )
**LAMOILLE SOUTH UNIFIED UNION**                     )
**SCHOOL DISTRICT,**                                 )
                                                     )
**AND**                                              )
                                                     )
**LOWELL SCHOOL DISTRICT,**                          )
                                                     )
**AND**                                              )
                                                     )
**LUDLOW-MOUNT HOLLY UNIFIED**                       )
**UNION SCHOOL DISTRICT,**                           )
                                                     )
**AND**                                              )
                                                     )
**MAPLE RUN UNIFIED SCHOOL**                         )
**DISTRICT,**                                        )
                                                     )
**AND**                                              )

iv

**MARLBORO SCHOOL DISTRICT,**
**AND**                                                    )
)
)
**MILL RIVER UNIFIED UNION SCHOOL**                        )
**DISTRICT,**                                              )
)
**AND**                                                    )
)
**MILTON TOWN SCHOOL DISTRICT,**                           )
)
**AND**                                                    )
)
**MISSISQUOI VALLEY SCHOOL**                               )
**DISTRICT,**                                              )
)
**AND**                                                    )
)
**MONTPELIER ROXBURY SCHOOL**                              )
**DISTRICT,**                                              )
)
**AND**                                                    )
)
**MOUNT ABRAHAM UNIFIED SCHOOL**                           )
**DISTRICT,**                                              )
)
**AND**                                                    )
)
**MOUNT ASCUTNEY SCHOOL**                                  )
**DISTRICT,**                                              )
)
**AND**                                                    )
)
**MOUNT MANSFIELD UNIFIED UNION**                          )
**SCHOOL DISTRICT,**                                       )
)
**AND**                                                    )
)
**NEWPORT CITY SCHOOL DISTRICT,**                          )
)
**AND**                                                    )
)
**NEWPORT TOWN SCHOOL DISTRICT,**                          )
)
**AND**                                                    )
)
**NORTH COUNTRY UNION HIGH**                               )
**SCHOOL DISTRICT,**                                       )
)

AND                                          )
                                             )
**NORTH COUNTRY UNION JUNIOR**               )
**HIGH SCHOOL BOARD,**                        )
                                             )
AND                                          )
                                             )
**NORTHERN MOUNTAIN VALLEY**                 )
**UNION SCHOOL DISTRICT,**                    )
                                             )
AND                                          )
                                             )
**NORWICH-HANOVER INTERSTATE**               )
**SCHOOL DISTRICT,**                          )
                                             )
AND                                          )
                                             )
**ORANGE SOUTHWEST UNIFIED**                 )
**UNION SCHOOL DISTRICT,**                    )
                                             )
AND                                          )
                                             )
**ORLEANS SOUTHWEST UNION**                  )
**ELEMENTARY SCHOOL DISTRICT,**              )
                                             )
AND                                          )
                                             )
**OTTER VALLEY UNIFIED UNION**               )
**SCHOOL DISTRICT,**                          )
                                             )
AND                                          )
                                             )
**OXBOW UNIFIED UNION SCHOOL**               )
**DISTRICT,**                                 )
                                             )
AND                                          )
                                             )
**PAINE MOUNTAIN SCHOOL**                    )
**DISTRICT,**                                 )
                                             )
AND                                          )
                                             )
**PITTSFIELD SCHOOL DISTRICT,**              )
                                             )
AND                                          )
                                             )
**QUARRY VALLEY UNIFIED UNION**              )
**SCHOOL DISTRICT,**                          )

**AND**                                              )
                                                     )
**READSBORO SCHOOL DISTRICT,**                       )
                                                     )
**AND**                                              )
                                                     )
**RIVER VALLEYS UNIFIED SCHOOL**                     )
**DISTRICT,**                                        )
                                                     )
**AND**                                              )
                                                     )
**ROCHESTER-STOCKBRIDGE UNIFIED**                    )
**DISTRICT,**                                        )
                                                     )
**AND**                                              )
                                                     )
**ROCKINGHAM SCHOOL DISTRICT,**                      )
                                                     )
**AND**                                              )
                                                     )
**RUTLAND TOWN SCHOOL DISTRICT,**                    )
                                                     )
**AND**                                              )
                                                     )
**SHARON SCHOOL DISTRICT,**                          )
                                                     )
**AND**                                              )
                                                     )
**SLATE VALLEY UNIFIED UNION**                       )
**SCHOOL DISTRICT,**                                 )
                                                     )
**AND**                                              )
                                                     )
**SOUTH BURLINGTON SCHOOL**                          )
**DISTRICT,**                                        )
                                                     )
**AND**                                              )
                                                     )
**SOUTH HERO SCHOOL DISTRICT,**                      )
                                                     )
**AND**                                              )
                                                     )
**SPRINGFIELD SCHOOL DISTRICT,**                     )
                                                     )
**AND**                                              )
                                                     )
**ST. JOHNSBURY SCHOOL DISTRICT,**                   )
                                                     )

vii

AND                                               )
                                                  )
**STAMFORD SCHOOL DISTRICT,**                     )
                                                  )
AND                                               )
                                                  )
**STAFFORD SCHOOL DISTRICT,**                     )
                                                  )
AND                                               )
                                                  )
**THETFORD TOWN SCHOOL**                          )
**DISTRICT,**                                     )
                                                  )
AND                                               )
                                                  )
**TROY SCHOOL DISTRICT,**                         )
                                                  )
AND                                               )
                                                  )
**TWIN VALLEY DISTRICT,**                         )
                                                  )
AND                                               )
                                                  )
**TWINFIELD UNIFIED SCHOOL**                      )
**DISTRICT,**                                     )
                                                  )
AND                                               )
                                                  )
**VERNON TOWN SCHOOL DISTRICT,**                  )
                                                  )
AND                                               )
                                                  )
**WAITS RIVER VALLEY UNION**                      )
**SCHOOL DISTRICT,**                              )
                                                  )
AND                                               )
                                                  )
**WEATHERSFIELD SCHOOL DISTRICT,**                )
                                                  )
AND                                               )
                                                  )
**WELLS SPRING UNIFIED UNION**                    )
**SCHOOL DISTRICT,**                              )
                                                  )
AND                                               )
                                                  )
**WEST RIVER MODIFIED UNION**                     )
**EDUCATION DISTRICT,**                           )

|                                              |     |
|----------------------------------------------|-----|
|                                              | )   |
| **AND**                                      | )   |
|                                              | )   |
| **WESTMINSTER SCHOOL DISTRICT,**             | )   |
|                                              | )   |
| **AND**                                      | )   |
|                                              | )   |
| **WHITE RIVER UNIFIED DISTRICT,**            | )   |
|                                              | )   |
| **AND**                                      | )   |
|                                              | )   |
| **WINDHAM NORTHEAST UNION ELEMENTARY SCHOOL DISTRICT,** | )   |
|                                              | )   |
| **AND**                                      | )   |
|                                              | )   |
| **WINDHAM SCHOOL DISTRCT,**                  | )   |
|                                              | )   |
| **AND**                                      | )   |
|                                              | )   |
| **WINDHAM SOUTHEAST SCHOOL DISTRICT,**       | )   |
|                                              | )   |
| **AND**                                      | )   |
|                                              | )   |
| **WINDSOR CENTRAL UNIFIED UNION SCHOOL DISTRICT,** | )   |
|                                              | )   |
| **AND**                                      | )   |
|                                              | )   |
| **WINOOSKI SCHOOL DISTRICT,**                | )   |
|                                              | )   |
| **AND**                                      | )   |
|                                              | )   |
| **WOLCOTT SCHOOL DISTRICT,**                 | )   |
|                                              | )   |
|                                              | )   |
| **PLAINTIFFS,**                              | )   |
|                                              | )   |
| **VS.**                                      | )   |
|                                              | )   |
| **MONSANTO CO.,**                            | )   |
|                                              | )   |
| **AND**                                      | )   |
|                                              | )   |
| **SOLUTIA, INC.,**                           | )   |
|                                              | )   |
| **AND**                                      | )   |

)

**PHARMACIA LLC,**                                        )

)

                        **DEFENDANTS.**          )

## COMPLAINT

x

## Table of Contents

I.    NATURE OF THE ACTION ................................................................................. 1

II.   PARTIES ........................................................................................................... 4

Ill.  JURISDICTION AND VENUE .............................................................................. 11

IV.   FACTUAL ALLEGATIONS ................................................................................ 12

    A.   Old Monsanto intentionally misled the public about the dangers posed by its
        PCB products ............................................................................................... 12

        1.   PCBs are dangerous chemicals .................................................... 12

        2.   Old Monsanto knew PCBs were dangerous contaminants—even as it
              told its customers that PCBs were safe ....................................... 15

        3.   Prior to the construction of District facilities, Old Monsanto
              knew its PCBs would cause indoor air contamination—yet it
              falsely reassured the public that the opposite was true .............................. 20

        4.   Old Monsanto deliberately declined to perform additional PCB
              analyses—because it knew what these analyses would show .................. 23

        5.   In the period after certain Districts' facilities were constructed, Old
              Monsanto doubled down on deception to protect its PCB franchise ......... 25

    B.   Old Monsanto's manufacture, marketing, sale, and distribution of PCBs
        caused the contamination of the Districts' schools ............................................... 29

        1.   Old Monsanto deceived the public about whether PCBs were suitable
              for use in the building materials used at the Districts' campuses ............... 29

        2.   PCB contamination at the Districts' campuses has or will make it
              impossible to use these buildings ................................................. 31

    FIRST CAUSE OF ACTION .................................................................................... 32

    SECOND CAUSE OF ACTION ............................................................................... 35

    THIRD CAUSE OF ACTION ................................................................................... 37

    FOURTH CAUSE OF ACTION ............................................................................... 39

    FIFTH CAUSE OF ACTION .................................................................................... 42

    SIXTH CAUSE OF ACTION ................................................................................... 43

    PRAYER FOR RELIEF .......................................................................................... 44

    DEMAND FOR JURY TRIAL ................................................................................. 45

The Plaintiffs identified in the style hereinabove and individually hereinbelow ("Vermont School District Plaintiffs"), by and through its undersigned counsel, bring this action against defendants Monsanto Co., Solutia, Inc., and Pharmacia LLC ("Defendants"). These Defendants have succeeded to the liabilities of an earlier Monsanto entity, also named Monsanto Company and referred to herein as "Old Monsanto"; the Defendants are, together with Old Monsanto, referred to herein collectively as "Monsanto." Monsanto is controlled by an alien German company called BAYER AG. Plaintiffs alleges as follows:

## I.      NATURE OF ACTION

1.      Polychlorinated biphenyls ("PCBs") are toxic and dangerous chemical compounds that were manufactured, marketed, sold, and distributed by Monsanto in the United States from approximately 1929 to 1977. During that period, Monsanto was responsible for the manufacture of 99% or more of all PCBs used or sold within the United States. There are no known natural sources of PCBs. The Vermont School District Plaintiffs own and operate campus and school buildings and facilities that are contaminated with "PCBs". The Schools served as or continue to serve as education facilities for tens of thousands of students.

2.      Plaintiffs' premises have dangerously elevated concentrations of Defendants' PCBs.

3.      The source of this PCB contamination is construction materials made with Monsanto's PCBs in plasticizer applications, including caulking, glazing, sealants, and flooring adhesives.

4.      Where PCBs and PCB-containing plasticizer products are used in building construction materials, as at Plaintiffs' premises, indoor air contamination from off-gassing is

1

inevitable. And because PCBs continue to be released from building materials for decades and, once released, persist in the indoor environment for even longer, concentrations in indoor air can continue to increase almost indefinitely after contaminated materials are installed. These facts can make the indoor environment progressively more hazardous over time.

5.     Relatedly, PCBs leach or migrate from their applications (such as caulking or adhesives) into porous surfaces and building materials with which those applications are in contact, such as masonry, wood, and concrete.

6.     PCBs are highly toxic and bio-accumulative in humans. Exposure to even small amounts of PCBs is known to increase the risk of harm to neurological, cognitive, endocrinal, hepatic, and other biological systems.

7.     PCBs are most dangerous to children and adolescents, who are more susceptible to PCBs' neurodevelopmental impacts than adults.

8.     In combination, these properties render PCBs highly inappropriate and unreasonably dangerous for use in school building construction because it is inevitable that, as time passes, PCBs will leach from their applications and be emitted into the air and deposited onto surfaces in schools, where they will persist and accumulate indefinitely-resulting in long-term exposure of persons spending time in such buildings, including children and adolescents, who are the most vulnerable.

9.     Monsanto manufactured and promoted its commercial PCB products for use in construction. Indeed, Monsanto developed a range of PCB-based plasticizer products specifically intended for use by the construction industry, promoting both their "non-toxic" and "non-volatile" profile.

2

10.     PCBs in a school environment present unique dangers. Children and adolescents are more sensitive to the health effects of PCBs than adult populations, and regulators have reflected this fact by establishing tolerances designed to protect children and adolescents against cancer and noncancer risks posed by PCB exposure.

11.     In Vermont, the screening level for PCBs in indoor air is 15 $ng/m^3$. To indicate when schools need to identify and abate potential sources of PCBs inside their buildings, the Vermont Department of Health has promulgated school-specific action levels. For grade 7 to adult (including high schools), the School Action Level ("SAL") is 100 $ng/m^3$. The Vermont Department of Health has also emphasized that even concentrations below the SAL will cause an increased risk of cancer, that the higher SAL value is based in part on the challenges of removing PCBs that are so widespread, and that PCB levels in the indoor air of schools should be kept as low as possible.

12.     As a result of exceedances of the Vermont SAL applicable to high schools, and to protect the health of students and employees, Plaintiffs' Districts need to monitor the levels of PCBs in school buildings.

13.     The presence of PCBs in the Districts will require certain Districts to make alternative arrangements to provide adequate educational facilities to serve District students.

14.     Facilities will need to be modified to meet this purpose, at a significant cost. Certain of the Plaintiffs' Districts also pay rent to lease temporary facility on an annual basis.

15.     Due to the presence of PCBs in the Plaintiffs' Districts' school buildings, Plaintiffs Districts must review options for remediating the campus buildings contaminated by PCBs and for designing and constructing replacement facilities. Because the contamination is so extensive,

3

however, including PCBs that had leached into the concrete foundations of certain buildings and into structural walls surrounding windows, adequate remediation will be prohibitively costly, impractical and/or physically impossible. Certain Plaintiffs' Districts will have no choice but to raze the buildings of the campus and replace them with an entirely new set of safe, PCB-free buildings.

16.      The remediation and/or the design and construction of replacement facilities, and demolition and removal of PCB-contaminated facilities and soils, will cost Plaintiffs many millions of dollars, and in the aggregate hundreds of millions, if not billions, of dollars.

17.      In the absence of elevated PCB concentrations, the existing campus facilities would have remained safely useable.

18.      The Districts bring this action to recover past, present, and future costs, losses, damages, and other relief relating to the presence of toxic PCBs manufactured by Monsanto in District properties. Such costs, losses, and damages include those resulting from or associated with the investigation and response to PCB contamination, including the lease, renovation and remodeling of temporary facilities, and remediation and/or design and construction of replacement facilities.

## II.      PARTIES

19.    Plaintiffs herein are:

      a.   Addison Central School District;

      b.   Addison Northwest School District;

      c.   Alburgh School District;

      d.   Barre Unified Union School District;

      e.   Barstow Unified Union School District;

4

f.  Bellows Falls Union High School District;

g.  Blue Mountain Union School District;

h.  Brighton School District;

i.  Burr and Burton Academy;

j.  Cabot School District;

k.  Cambridge School District;

l.  Champlain Islands Unified Union School District;

m.  Champlain Valley School District;

n.  Charleston School District;

o.  Colchester School District;

p.  Coventry School District;

q.  Craftsbury School District;

r.  Danville School District;

s.  Derby School District;

t.  Echo Valley Community School District;

u.  Enosburgh-Richford Unified Union School District;

v.  Essex Westford Educational Community Unified Union School District;

w.  Fairfax School District;

x.  First Branch Unified School District;

y.  Fletcher School District;

z.  Georgia School District;

aa. Green Mountain Unified School District;

bb. Halifax School District;

5

cc. Hartford School District;

dd. Hartland School District;

ee. Harwood Unified Union School District;

ff. Hazen Union School District;

gg. Holland School District;

hh. Jay-Westfield Joint Elementary School District;

ii. Kingdom East School District;

jj. Lake Region Union Elementary-Middle School District;

kk. Lake Region Union High School District;

ll. Lamoille North Modified Unified Union School District;

mm. Lamoille South Unified Union School District;

nn. Lowell School District;

oo. Ludlow-Mount Holly Unified Union School District;

pp. Maple Run Unified School District;

qq. Marlboro School District;

rr. Mill River Unified Union School District;

ss. Milton Town School District;

tt. Missisquoi Valley School District;

uu. Montpelier Roxbury School District;

vv. Mount Abraham Unified School District;

ww. Mount Ascutney School District;

xx. Mount Mansfield Unified Union School District;

yy. Newport City School District;

zz. Newport Town School District;

aaa.  North Country Union High School District;

bbb.  North Country Union Junior High School Board;

ccc.  Northern Mountain Valley Union School District;

ddd.  Norwich-Hanover Interstate School District;

eee.  Orange Southwest Unified Union School District;

fff. Orleans Southwest Union Elementary School District;

ggg.  Otter Valley Unified Union School District;

hhh.  Oxbow Unified Union School District;

iii. Paine Mountain School District;

jjj. Pittsfield School District;

kkk.  Quarry Valley Unified Union School District;

lll. Readsboro School District;

mmm.         River Valleys Unified School District;

nnn.  Rochester-Stockbridge Unified District;

ooo.  Rockingham School District;

ppp.  Rutland Town School District;

qqq.  Sharon School District;

rrr. Slate Valley Unified Union School District;

sss. South Burlington School District;

ttt. South Hero School District;

uuu.  Springfield School District;

vvv.  St. Johnsbury School District;

www.  Stamford School District;

xxx. Stafford School District;

yyy. Thetford Town School District;

zzz. Troy School District;

aaaa. Twin Valley Unified School District;

bbbb. Twinfield Unified School District;

cccc. Vernon Town School District;

dddd. Waits River Valley Union School District;

eeee. Weathersfield School District;

ffff. Wells Spring Unified Union School District;

gggg. West River Modified Union Education District;

hhhh. Westminster School District;

iiii. White River Unified District;

jjjj. Windham Northeast Union Elementary School District;

kkkk. Windham School District;

llll. Windham Southeast School District;

mmmm.  Windsor Central Unified Union School District;

nnnn. Winooski School District; and

oooo. Wolcott School District.

20. Pursuant to 18 V.S.A. § 126, Plaintiffs are all Vermont municipal corporations. Plaintiffs are all citizens of Vermont.

21. All Plaintiffs claims are properly joined under FRCP 20, in that they assert rights jointly, severally, or in the alternative with respect to or arising out of the same occurrence, or

services of transaction or occurrences and common questions of law and fact to all Plaintiffs will arise in this action. All Plaintiffs' claims are brought under the same causes of action as a result of a common scheme of Defendants' regarding the same products, namely Defendants' PCBs and PCB-containing building and plasticizer products that were used in a common fashion across Districts on and in their schools' campuses and facilities during common periods of manufacture, production, and sale, as further described in great detail herein.

22.     Defendant Monsanto Co. is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business located at 800 North Lindbergh Boulevard, St. Louis, Missouri, 63167. Following a merger transaction that closed in 2018, Monsanto Co. is a wholly-owned subsidiary of Bayer AG.

23.     Defendant Solutia, Inc. is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business located at 575 Maryville Centre Dr., St. Louis, Missouri, 6314 I. Solutia, Inc. is a wholly-owned subsidiary of Eastman Chemical Company.

24.     Defendant Pharmacia LLC is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business at 100 Route 206 North, Peapack, New Jersey, 07977. The sole member of Pharmacia LLC is Wyeth Holdings LLC. The sole member of Wyeth Holdings LLC is Anacor Pharmaceuticals, LLC. Anacor Pharmaceuticals, LLC is a limited liability company organized and existing under the laws of the State of Delaware and based in New York. Although the membership of Anacor Pharmaceuticals, LLC is not listed in any of its filings with the Delaware Division of Corporations, Plaintiffs are unaware of any information that would indicate that its members are citizens of Vermont or of a foreign state. On November 2, 2022, Pharmacia invoked federal diversity jurisdiction in the U.S. District Court for

9

the Northern District of California and informed that court that "Pharmacia LLC is a citizen of New York and Delaware for purposes of diversity jurisdiction."

25.     Pharmacia LLC, formerly known as Pharmacia Corporation, is the successor to Old Monsanto.

26.     Old Monsanto operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business.

27.     Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were reorganized to form three separate corporations. The corporation now known as Monsanto Co. operates Old Monsanto's agricultural products business. Old Monsanto's chemical products business is now operated by Solutia, Inc. Old Monsanto's pharmaceutical business is now operated by Pharmacia LLC.

28.     Solutia, Inc. was organized by Old Monsanto to own and operate its chemical manufacturing business, and assumed the operations, assets, and liabilities of Old Monsanto's chemical business.

29.     Although Solutia, Inc. assumed and agreed to indemnify Pharmacia LLC for certain liabilities related to the chemicals business, Defendants have also entered into agreements to share or apportion liabilities, and/or to indemnify each other, for claims arising from Old Monsanto's chemical business, including the manufacture and sale of PCBs and PCB-containing products.

30.     In 2003, Solutia, Inc. filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia, Inc.'s reorganization was completed in 2008. In connection with Solutia, Inc.'s Plan of Reorganization, Defendants entered into several agreements under which Monsanto Co. continues to manage and assume financial responsibility

10

for certain tort litigation and environmental remediation related to the chemicals business.

31.     Eastman Chemical Co. ("Eastman") reported in its 2020 Form 10-K that it "has been named as a defendant in several [legacy tort] proceedings and has submitted the matters to [New] Monsanto, which was acquired by Bayer AG in June 2018, as Legacy Tort Claims [as defined in a settlement agreement with Monsanto arising out of Solutia, Inc.'s bankruptcy proceedings). To the extent these matters are not within the meaning of Legacy Tort Claims, Solutia could potentially be liable thereunder. In connection with the completion of its acquisition of Solutia, Eastman guaranteed the obligations of Solutia and Eastman was added as an indemnified party under the Monsanto Settlement Agreement."

32.     In its Form 10-K for the period ending August 31, 2017, filed with the U.S. Securities and Exchange Commission (the last such filing before Bayer AG acquired Monsanto Co.), Monsanto Co. represented that it: "is involved **in** environmental remediation and legal proceedings to which Monsanto is a party in its own name and proceedings to which its former parent, Pharmacia LLC or its former subsidiary, Solutia, Inc. is a party but that Monsanto manages and for which Monsanto is responsible pursuant to certain indemnification agreements. In addition, Monsanto has liabilities established for various product claims. With respect to certain of these proceedings, Monsanto has established a reserve for the estimated liabilities." The filing specifies that the company held $277 million in that reserve as of August 31, 2017.

## III.     JURISDICTION AND VENUE

33.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiffs and Defendants, and the amount in controversy exceeds the minimal jurisdictional limits of this Court. As set forth above, Plaintiffs are all citizens of Vermont, but no Defendant is a citizen of Vermont.

34.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(a) because

11

the properties that are the subject of the action are situated in this judicial district.

## IV.   FACTUAL ALLEGATIONS

### A.   Old Monsanto intentionally misled the public about the dangers posed by its PCB products.

#### 1.   PCBs are dangerous chemicals.

##### (a)   Physical and chemical properties of PCBs.

35.     Old Monsanto began manufacturing commercial PCB mixtures in 1935 after acquiring Swann Chemical Company, which manufactured PCBs from 1929 to 1935. Old Monsanto continued to manufacture such products until the late 1970s.

36.     PCBs are a class of synthetic organic chemical compounds in which a minimum of two, and a maximum of ten chlorine atoms are attached to a biphenyl molecule. There are no known natural sources of PCBs in the environment.

37.     There are 209 distinct PCB compounds (known as congeners) with two to ten chlorine atoms on a biphenyl molecule. The number and placement of the chlorine atoms on the biphenyl molecule determines how the congener is named and dictates its environmental fate and toxicity.

38.     Old Monsanto manufactured, marketed, and sold mixtures of various PCB congeners primarily under the "Aroclor" trade name. Aroclors are differentiated principally by the composition of chlorine by weight, so, for example, "Aroclor 1254" means the mixture contains approximately 54% chlorine by weight. Generally, the higher the chlorine content of a PCB mixture, the greater its chemical stability and environmental persistence and the lighter the mixture the greater its capacity to off-gas.

39.     Old Monsanto's commercial PCB formulations sought to maximize the products' stability, and thus also their persistence and resistance to degradation. PCBs do not burn easily, are

relatively insoluble in water, and adsorb to solids and particulate matter.

40.    PCBs do not bind completely to other materials (or to one another).  Over time, they leach, off-gas, and migrate from their original applications, contaminating other environmental media such as air and water, or materials.

41.    PCBs are "semi-volatile" in that they volatilize or form a gas. PCB vapors escape from virtually any application, particularly when PCB mixtures are used as plasticizers in materials such as caulking, adhesives, varnishes, waxes, rubbers, paints, and similar products.

42.    PCB volatilization rises with increases in temperature, *i.e.,* more PCBs are released into the air from PCB-containing products or PCB-contaminated sites as temperature increases.  Small amounts of PCBs vaporize from PCB-containing products, resulting in transport of PCB vapors, at normal environmental temperatures.

43.    PCB leaching likewise occurs over time, particularly where PCB mixtures are used as plasticizers in construction materials that are applied to or near porous surfaces, such as masonry, wood, and concrete.  As PCBs escape from caulking, adhesives, varnishes, waxes, rubbers, paints, and similar materials, they seep into other materials in contact with them.

44.    Defendants' PCBs escape their immediate applications, slowly but definitely, to cause contamination of surrounding air or other environmental media and other materials during their ordinary **and** prescribed uses.

45.    As vapors, PCBs travel through the air, eventually settling on nearby surfaces and in dust, and continue to circulate in the air indefinitely.

46.    Similarly, PCBs can be released to air and soil by routine grinding, scraping, and removal of caulking and other construction materials that include PCBs, resulting in contamination of nearby surfaces, air, and other media.

13

47.     Old Monsanto advised customers to integrate their PCB mixtures into construction materials, such as caulk, sealants, adhesives, and other materials, despite knowing that this would directly introduce PCBs into surrounding air and other construction materials, and onto nearby interior surfaces.

48.     Once released from their applications, PCBs do not break down readily; they remain indefinitely absent remediation and removal.

### (b)     Health effects of exposure to PCBs.

49.     Humans are exposed to PCBs in indoor environments by breathing contaminated air. The air is typically contaminated by PCBs released from construction materials or other applications.

50.     The Vermont Department of Health set screening levels and SALs based on both cancer and non-cancer health effects associated with PCBs.

51.     Many studies have documented these effects. Human health effects associated with PCB exposure include, without limitation, liver, thyroid, dermal, and ocular changes, immunological alterations, neurodevelopmental and neurobehavioral changes, reduced birth weight, reproductive toxicity, and cancer. Babies born to women exposed to PCBs before and during pregnancy showed abnormal responses to infant behavioral tests, including motor skills, and experienced short-term memory deficiencies.

52.     Neurological changes associated with PCB exposure include abnormal reflexes and deficits in memory, learning, impulse control, and IQ. Such changes impact infants and children more severely than adults. PCBs are known neurotoxins.

53.     Reproductive changes associated with PCB exposure include menstrual disturbances in women and effects on sperm morphology and production in men, all of which can

result in difficulty conceiving.

54.     PCBs are associated with a number of cancers, including cancer of the liver, biliary tract, intestines, and skin (melanoma).

55.     In 1996, the U.S. EPA assessed PCB carcinogenicity based on data related to Aroclors 1016, 1242, 1254, and 1260.  EPA's cancer assessment was peer-reviewed by fifteen experts on PCBs, including scientists from government, academia, and industry.  All experts agreed that PCBs *are* probable human carcinogens.

56.     The U.S. Department of Health and Human Services' National Toxicology Program considers PCBs to be "reasonably anticipated to be human carcinogens."

57.     The International Agency for Research on Cancer ("'IARC'"), an intergovernmental agency forming part of the World Health Organization of the United Nations, concluded in March 2013, based on the assessments of twenty-six experts from twelve countries, that PCBs are known human carcinogens.

58.     In its formal 2016 report, the IARC stated, "[t]here is sufficient evidence in humans for the carcinogenicity of [PCBs].  PCBs cause malignant melanoma.  Positive associations have been observed for non-Hodgkin lymphoma and cancer of the breast .......PCBs are carcinogenic to humans."

### 2.     Old Monsanto knew PCBs were dangerous contaminants—even as it told its customers that PCBs were safe.

59.     Old Monsanto knew its PCB compounds were highly toxic as early as 1937.  Old Monsanto also knew well before 1970 that a number of studies, both internal and external, had demonstrated human and animal toxicity.

60.     Old Monsanto developed an early, sophisticated understanding of the dangers

associated with PCB compounds and PCB-containing products, such as Aroclors.

61.     In 1936, many workers at a New York facility using PCBs operated by Halowax Corporation were afflicted with severe chloracne, a serious skin disorder characterized by chronic inflammation of the skin causing eruptions of cysts and pustules. Three workers died and autopsies revealed severe liver damage in two of them.

62.     Halowax Corporation asked Harvard University researcher Cecil K. Drinker to investigate the issue, and Dr. Drinker's analysis was presented at a 1937 meeting attended by high-level personnel employed by Old Monsanto.

63.     Dr. Drinker's investigation revealed that rats exposed to PCBs suffered severe liver damage. Dr. Drinker's results were published in a September 1937 issue of the *Journal of Industrial Hygiene and Toxicology.*

64.     That same year, Old Monsanto admitted in an internal report that PCBs produce "systemic toxic effects" as a result of prolonged exposure to PCB vapors or oral ingestion, and that bodily contact with PCBs produces "an acne-form skin eruption."

65.     Old Monsanto subsequently retained Dr. Drinker to conduct further animal studies. In September 1938, Dr. Drinker confirmed liver damage in rats exposed to various formulations of PCB compounds.

66.     Other studies also explored and confirmed the toxicity of chlorinated hydrocarbons like PCBs. A 1939 study published in the *Journal of Industrial Hygiene and Toxicology,* for example, referenced the worker fatalities investigated by Dr. Drinker and went on to conclude that pregnant women and persons previously affected by liver disease are particularly susceptible to adverse effects from chlorinated hydrocarbons, like PCBs.

67.     In February 1950, Old Monsanto Medical Director Dr. R. Emmet Kelly

acknowledged that when workers fell ill at an Indiana factory that used PCBs in the manufacturing process, he immediately "suspected the possibility that the Aroclor fumes might have caused liver damage."

68.    An internal Monsanto document from February 1952 noted "the few deaths, and relatively large number of acne or dermatitis cases arising during the war, in connection with fabricators of Navy cable coating materials using a mixture of Aroclor 4456 and Halowax" and stated that the "toxicity hazard of Aroclor's fumes is well established."

69.    A 1955 report on the production of Aroclor prepared by Old Monsanto acknowledged that in the "early days of development," workers at a plant in Anniston, Alabama processing PCBs had developed chloracne and liver problems.

70.    In September 1955, Dr. Kelly further documented Old Monsanto's clear understanding: "We know Aroclors are toxic." Dr. Kelly also appeared to recognize the scope of Old Monsanto's potential legal liability, explaining that "our main worry is what will happen if an individual develop[s] any type of liver disease and gives a history of Aroclor exposure. I am sure the juries would not pay a great deal of attention to [maximum allowable concentration levels]."

71.    Old Monsanto's Medical Department prohibited workers from eating lunch in the Aroclor department in November 1955. The Medical Department memorandum explained that "Aroclor vapors and other process vapors could contaminate the lunches unless they were properly protected."

72.    A 1956 report by Old Monsanto acknowledged that Aroclors "can give rise to dermatitis when contacted with the skin" and that "[i]nhalation of vapors is usually followed by systemic poisoning." A 1966 Old Monsanto report similarly admitted that Aroclors have

"high toxicity for vapor inhalation. This material can cause dermatitis, systemic poisoning from the fumes, and yellow atrophy of the liver. Especially at elevated temperatures, extreme caution should be exercised."

73.     In January 1957, Dr. Kelly reported that the U.S. Navy had refused to use Old Monsanto's PCB products in submarines. The Navy had tested Pydraul 150 (one of Old Monsanto's PCB products) on rabbits. The Navy informed Old Monsanto that skin applications had "caused death in all of the rabbits tested" and that the "[t]he inhalation of 10 milligrams of Pydraul 150 per cubic meter or approximately 2 tenths of a part of the Aroclor component per million for 24 hours a day for 50 days caused, statistically, definite liver damage." According to Dr. Kelly, "[n]o matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 is just too toxic for use in a submarine."

74.     Despite receiving such data, four months later in April 1957, Elmer P. Wheeler, Assistant Director of the Medical Department stated in a letter to Standard Oil Company that Pydraul 150 is "practically innocuous" when fed to rats and that "Pydraul 150 was not more irritating than a 10% soap solution" in rabbit skin and eye studies. These statements were false and contradicted what the Navy had just informed Old Monsanto about the damning results from the Navy's own rabbit study. Similarly, Or. Kelly assured U.S. Steel Corporation in 1955 that "[w]e have tested Pydraul F-9 very completely from the chronic point of view....I can assure you that exposures to large quantities of Pydraul F-9 for short periods of time ...  will not cause any toxic effects on the worker." Dr. Kelly's statement that Monsanto had undertaken chronic toxicity studies was false.

75.     In 1958, Old Monsanto again attempted to downplay customer concerns about its PCB products. Socony Mobil had made a "specific request" to use a label warning its own

customers about Pydraul purchased from Monsanto for resale. The label would have warned customers to "[a]void prolonged breathing of vapors or mists." According to a 1958 memo sent by an Old Monsanto employee to Old Monsanto's medical department, "the wording.....is not in the best interest of Pydraul sales," and it was important to avoid giving "any unnecessary information which could very well damage [Old Monsanto's] sales position in the synthetic hydraulic fluid field." In the same year, Dr. Kelly sent a letter to Socony Mobil objecting to any attempt to provide a "do not breathe fumes" instruction to Pydraul users. Dr. Kelly told Socony Mobil that the warning was suitable to a "pretty toxic fluid," and contradicted Old Monsanto studies which showed that Pydrauls were (according to Dr. Kelly) non-lethal in rats and rabbits—assertions by Dr. Kelly that contradicted the Navy's deadly tests on rabbits only three years before: "While ... it is none of our affair how you people label your products, we do have some interest inasmuch as it might create some confusion" about Old Monsanto's labelling.

76.     In a March 1962 letter to the U.S. Public Health Service, Dr. Kelly acknowledged Old Monsanto's "extensive inhalation tests" on certain Aroclors, and acknowledged that, "if sufficient material were inhaled, liver problems would develop." But Dr. Kelly downplayed these risks, by falsely stating that "our experience and the experience of our customers over a period of nearly 25 years, has been singularly free of difficulties."

77.     In July 1965, Dr. Kelly reassured another Old Monsanto customer (E.I. duPont de Nemours & Company) that Pydraul products were harmless. He repeated Monsanto's false statement that Pydraul 150 was "practically innocuous when fed" to rats and "no more irritating than a 10 per cent soap solution" in rabbit skin and eye tests. Dr. Kelly went on to state that "[t]he question of possible carcinogenesis" was something that "certainly can be dismissed completely, as we have no reason to believe the components of this compound would have this type of

19

action." Once again, Dr. Kelly failed to tell the customer about the 100% fatality rate in the Navy's rabbit tests, or about the extensive other data showing the toxicity of PCBs and Pydrauls specifically. Moreover, Monsanto had very deliberately decided not to conduct the sort of cancer studies necessary to support Dr. Kelly's assertion that any possibility of carcinogenicity "can be dismissed completely."

78.     Similarly, an October 1971 internal Monsanto report noted that customers using FR fluid-a product containing PCBs-in their food process systems were told by Monsanto representatives that these products "were completely safe from contamination and could even be drunk without harmful side effects."

### 3.   Prior to the construction of District facilities, Old Monsanto knew its PCBs would cause indoor air contamination—yet it falsely reassured the public that the opposite was true.

79.     Old Monsanto conducted a series of studies in the 1940s, 1950s, and early 1960s concerning the volatilization of PCBs in ordinary use. These studies provided information to Old Monsanto above and beyond the tests and incidents described above demonstrating the toxicity of PCBs.

80.     By this time, Old Monsanto already knew that its PCBs were highly stable, inert, and resistant to degradation, such that if PCBs were emitted via vaporization or volatilization from product applications, those PCBs would remain in circulation rather than break down.

81.     In 1954. Old Monsanto conducted a study to measure the concentration of PCBs escaping into the air from PCB-containing styrene latex paint. The study showed PCBs escaped from the paint into the indoor air, and that in a heated room in particular the concentration of PCBs in the air would remain high for a long period of time. The 1954 study

did not examine PCB vapor condensation or settlement in dust or otherwise study the fate

of the PCBs released from the paint. But because Monsanto knew its PCBs were extremely

persistent and inert, Monsanto knew or should have known that the PCBs emitted from the

paint ultimately settled on surfaces in the test room and did not simply disappear.

82.     In a 1955 document, "Process for the Production of Aroclors, Pyranols, etc. at

the Anniston and at the Wm. G. Krummrich Plant," Monsanto presented a detailed overview

of the PCB production process. This process document included calculations of PCB volatility

at a range of temperatures and presented a vapor pressure curve summarizing these data,

confirming that at any temperature, Aroclor volatility is measurably positive. The process

document also recounted the results of various tests (such as evaporation loss tests) that

revealed PCB vapors of some magnitude are inevitably released from Monsanto's PCB

formulations, particularly but not only under heat.

83.     The vaporization or volatilization data presented in the 1955 process document

was generated in the 1940s and early 1950s.

84.     Despite Monsanto's clear knowledge that PCB vaporization or volatilization

was an inevitable consequence of the ordinary use of its PCB products, Monsanto aggressively

marketed those products for a wide range of uses expressly on the basis that volatilization

would not occur.

85.     For instance, in an April 1949 product brochure promoting the use of Aroclor

plasticizers, Monsanto stated, "The Aroclors are non-volatile at normal temperatures."

86.     Similarly, in an advertisement published in trade publications such as *Chemical

& Engineering News* in 1961, Monsanto promoted the Aroclor "Genie of a Thousand and

One Engineering Feats," promising that the product is "VIRTUALLY INDESTRUCTIBLE:

resist breakdown from heat and mechanical stress, resist burning/rebuff electricity with their high resistivity/refuse to oxidize, volatilize, hydrolyze or otherwise react with highly reactive chemicals."

87.     In other "Aroclor Genie" ads from the same time and published in the same and similar trade publications, Monsanto falsely stated that PCBs do not volatilize, and attributed Aroclors' *"utter inertness"* to the "secret of the sorcery": "They stubbornly refuse to volatilize.... Use them *'per se'* as lubricants, dielectrics, reaction media, heat transferants."

88.     Monsanto further promoted the use of its Aroclors in sealing and caulking compounds where they would be open to the air breathed by people in buildings. For instance, in a 1960 product pamphlet, Monsanto advised that "Aroclors and polybutenes can be blended with inorganic fillers to make excellent sealing and caulking compounds." The same pamphlet falsely described Aroclors as "non-volatile" or "virtually non-volatile."

89.     Monsanto's PCB sales for plasticizer applications (including for use in caulking, sealing, and glazing compounds and adhesives) ramped up as its marketing increased. In 1964, Old Monsanto committed substantial capital to expand its PCB manufacturing facilities in Illinois and Alabama specifically to increase its production of PCB plasticizer products.

90.     As Old Monsanto general manager R.M. Morris wrote in an appropriations request, "The increased capacity is urgently needed to meet the rapidly expanding demand for the proprietary family of Aroclor Plasticizer and Functional Fluid products Monsanto enjoys a favorable position with the large diversified line of Aroclor products and formulations for a wide variety of applications. The objective of this project is to assure a continuous and dependable supply of products to satisfy the market needs." These "market needs" were created in large part by all the marketing described above, *e.g.,* touting Old Monsanto's PCB

22

products as "non-volatile"' substances suitable for use in caulk and sealants.

91.     Monsanto's warnings and instructions to its customers prior to the 1970s generally advised of potential hazards in certain industrial working conditions, but not of hazards associated with PCBs introduced into commerce through manufactured products like caulk, varnishes, waxes, and lacquers.

### 4.     Old Monsanto deliberately declined to perform additional PCB analyses—because it knew what these analyses would show.

92.     Over the course of 1950s and 1960s, Old Monsanto repeatedly considered and rejected undertaking additional studies about PCBs and their potential to contaminate indoor air. It made these decisions because it knew that these additional studies were nearly certain to show that PCBs were dangerous.

93.     Old Monsanto clearly understood that chemical manufacturers had a duty to undertake health and safety testing. For example, in October 1947, Dr. Kelly told the American Public Health Association that "many new products are being developed by manufacturers" and that manufacturers should undertake tests before marketing these chemicals to "make certain that no new chemical is used in a manner in which systemic toxicity or skin irritation might result either in workers making the product or in consumers."

94.     Yet Dr. Kelly repeatedly declined to undertake such tests for PCBs. For example, in 1955-the same year that Monsanto acknowledged internally that Aroclors are inevitably released from their applications into indoor air—Dr. Kelly counseled against studying the problem any further, precisely because it was so

unlikely any test would be able to demonstrate that Aroclors were safe in indoor settings. As Dr. Kelly wrote, when Aroclors are used in households they "can be used in almost any shape and form and we are never able to know how much of the concentration they are exposed to." But instead of accepting his own conclusion from 1947 that Monsanto had a duty to "make certain" these chemicals were safe before selling them, Dr. Kelly went on to argue that the seemingly unlimited potential for chronic exposure to Aroclors made it pointless to undertake additional toxicity testing: "[n]o amount of toxicity testing will obviate this ... dilemma and therefore I do not believe any more testing would be justified."

95.     As public concern about PCBs continued to grow, Old Monsanto continued to refuse to undertake additional tests. In 1967, Dr. Kelly wrote an internal memo expressing his concern that public anxiety about air pollution might lead to inquiries about PCB contamination— which in turn might lead to demands for "extensive" toxicological investigations that he was eager to avoid. "We are very worried about what is liable to happen in the [United States] when the various technical and lay news media pick up the subject [of PCB contamination). This is especially critical at this time because air pollution is getting a tremendous amount of publicity in the United States." But Dr. Kelly went on to express his concern that customers might "ask us for some sort of data concerning the safety of these residues in humans,'" and "[t]his obviously might be opening the door to an extensive and quite expensive toxicological/pharmacological investigation."

96.     In addition to its deliberate refusal to conduct testing of products it knew to be unsafe; Old Monsanto eventually began to direct its employees not to preserve PCB-related documents that might incriminate the company. In 1969, a management committee at

24

Old Monsanto wrote a draft report acknowledging that PCBs were escaping into the environment on a massive scale, including from highway paints and landfills. In response, Monsanto's legal department issued a directive to Monsanto employees to "call back all of those reports and burn them." Similarly, in December 1971, Old Monsanto attorneys recommended that the company maintain a file of external publications dealing with PCBs, but concluded that "those which are not helpful in a defense of PCB litigation should not be preserved (except as part of the attorney's work product in the defense of a case), since such documents would be subject to discovery."

> **5**     **In the period after certain Plaintiffs' facilities were constructed, Old Monsanto doubled down on deception to protect its PCB franchise.**

97.     By the mid-1960s, the truth about PCBs' toxicity started to become more difficult for Old Monsanto to deny-primarily as a result of research showing that Old Monsanto's PCBs had spread throughout the global ecosystem, and were injuring birds, fish and mammals across the planet. In 1966, the *New Scientist published* a short article ("Report of a New Chemical Hazard"), summarizing recent research by Soren Jensen, a Swedish chemist at Stockholm University's Institution of Analytical Chemistry. Dr. Jensen found enormous quantities of PCB compounds in wildlife and concluded that PCBs "appear to be the most injurious chlorinated compounds of all tested." A 1968 article in *Nature* by Dr. Richard Risebrough of the University of California confirmed that PCBs were ubiquitous in birds and marine wildlife.

98.     Old Monsanto's primary response to this published research was to continue misleading the public about PCBs. For example, in 1969, Monsanto admitted internally that

there was "little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls ... as nearly global environmental contaminants." Monsanto acknowledged that there was "no practical course of action" to prevent this mass contamination, but still insisted on taking steps "to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series." Another internal Monsanto document from this period was more succinct about the reasons why: "there is too much customer/market need and selfishly too much Monsanto profit to go out."

99.     Other internal documents from this period contain admissions about the dangers of the PCBs. In September 1969, W.R. Richard, an Old Monsanto researcher, wrote a memorandum entitled "Defense of Aroclor." Richard's memorandum noted that critics of PCBs had raised a multitude of different issues with the compounds, so "[w]e can't defend vs. everything," and that PCBs escape from virtually all applications, including in particular "open" applications such as plasticizers. In a similar vein, Elmer Wheeler, in Old Monsanto's Medical Department, circulated laboratory reports discussing results of animal studies in January 1970, in which Dr. Wheeler noted that "PCBs are about the same as DDT in mammals."

100.    But Old Monsanto's public statements from this period were very different—and blatantly false. In January 1970, the journal *Environment* published a note authored by Old Monsanto: "Monsanto Statement on PCB." The company note acknowledged that recent studies, including Dr. Jensen's studies, indicated PCBs' widespread presence in the natural environment, and expressed the company's "concern[] over the situation." But the note defended PCBs by deploying a variety of false statements that Old Monsanto used on multiple

26

occasions in the late 1960s and early 1970s to minimize the negative impacts of PCBs. In particular, Old Monsanto asserted that PCBs cannot escape "open" applications such as adhesives, elastomers, and surface coatings, and that it is simply "not true" that PCBs are "highly toxic." Old Monsanto knew that all these statements were untrue.

101.    In August 1970, a manager in Monsanto's Environmental Control department wrote a letter to Buffalo Children's Hospital in response to the Hospital's inquiry about "the possible toxic effects of PCB." The letter stated that "Monsanto has manufactured Aroclors for about 40 years and throughout the period we have not observed any harmful effects on our employees or our customer's employees" and that the author "cannot refer you to articles concerning poisoning cases with Aroclors, because after exhaustive search we have not found a single reported incident." This statement was false. As described in detail above, Old Monsanto was well aware of many incidents involving its own workers and was also aware of studies by itself and others (such as the U.S. Navy) showing that PCBs were toxic.

102.    Old Monsanto ultimately withdrew its PCB-containing Aroclor formulations intended for use as plasticizers or other "open" uses in or around 1971, but declined to inform or advise those utilizing such products for open use applications to take steps to prevent contamination, property damage, or personal injury.

103.    Indeed, even in 1980, after Old Monsanto stopped the manufacture of PCBs, it publicly and falsely stated that "PCBs are considered only mildly toxic on an acute basis when ingested by humans - about on the same order as common table salt" and that "[t]here has never been a single documented case in this country where PCBs ever caused serious human health problems."

27

104.    While Old Monsanto was aggressively marketing its PCB-based products and deceiving the public about their toxic qualities, it knew that there were safer, viable alternatives to those products. For example, Old Monsanto's internal documents acknowledge that its PCB- containing dielectric fluids, which it had marketed as having a lower risk of fire than mineral oil, in fact never offered any real advantage over mineral oil. A document concerning the company's product strategy for PCB-containing "askarel" dielectric fluids reports: "[T]he incidence of explosion with mineral oil was actually lower than with askarel! This in addition to the economic disadvantage of askarel leads to the embarrassing question of why bother to use askarel and lends an ear to complaints from the workers who dislike the odor, irritating and toxic qualities of our material."

105.    Likewise, many chemicals could perform the function of PCBs in various "open use" applications, such as caulk, adhesives, or varnishes, such that there was never any need to introduce hazardous PCBs for these types of uses. Indeed, when Old Monsanto ceased to manufacture and market PCBs for open uses, PCB-free versions of such products continued to be made, used, and sold.

106.    In short, Old Monsanto had a complete and comprehensive record of all PCB-related scientific research and general reportage during the relevant time period; indeed, an August 6, 1971, internal memorandum noted that the company "ha[s] probably the world's best reference file on the PCB situation."

107.    Nevertheless, the company failed to timely alert the public, or the end-users of its products, of the dangers of its PCBs, nor did it take adequate steps to stave off the impending environmental disaster, all to shield its sales, profits, and reputation—and to protect product lines that offered no concrete advantage over safer alternatives.

28

**B.**     **Old Monsanto's manufacture, marketing, sale, and distribution of PCBs caused the contamination of the Districts' Schools.**

   **1.**     **Old Monsanto deceived the public about whether PCBs were suitable for use in the building materials used at the Districts' campuses.**

108.     Old Monsanto sold its PCB mixtures for use in and knew that its PCBs were included in products that, when used as intended, were certain to directly result in contamination and property damage. These products include caulking and glazing compounds, sealants, adhesives, and other construction materials. This contamination and property damage are due principally to PCBs' persistence, their tendency to leach into porous materials in contact with them, their tendency to volatilize into air, and their toxicity to humans.

109.     Old Monsanto further sold its PCB mixtures for use in, and knew that its PCBs were used in, building materials utilized in the construction of schools, homes, and other buildings that would be used, inhabited, occupied, and attended by children and adolescents.

110.     Indeed, as alleged above, Old Monsanto expressly promoted its PCB plasticizer products for use in construction materials and promised that they would not volatilize from such applications, despite knowing or recklessly disregarding that this was untrue.

111.     Old Monsanto also promised that its PCB plasticizer products would not significantly leach from materials in which PCB plasticizers were used, despite knowing or recklessly disregarding that this was untrue.

112.     Old Monsanto never advised the Districts or the public that its PCB plasticizer products would inevitably teach, leak, off-gas, emit, discharge, and release PCBs, particularly

in such a manner as to pose a risk of harm to humans, from their ordinary and intended applications to contaminate indoor air and surfaces and cause property damage. Nor did Old Monsanto ever engage in chronic toxicity studies relevant to open applications of PCBs, despite knowing that acute PCBs exposure was toxic and despite taking steps to minimize acute exposure of its workers.

113.    Old Monsanto issued no public warning or instruction about such issues or the health hazards presented and, indeed, as alleged above, denied or concealed that such hazards existed in their public communications.

114.    In a 1949 plasticizer product brochure, Old Monsanto touted the non-toxic nature of its plasticizer products: "Several Monsanto plasticizers such as E-15, 8-16, and M-I7, have been used for years in applications where they come in intimate contact with the human body, or with foodstuffs. They have proved themselves to be non-toxic and satisfactory for such applications. This record of freedom from ill effects in actual use has been checked by animal experimentation. New plasticizers, such as Santicizer 141, have been and are under active animal experimentation. The results show that Santicizer 141 can be considered non-toxic for the above uses."

115.    The same product brochure extols the "permanence" of Old Monsanto's plasticizers.

116.    As the document explains, "The permanence of a plasticizer is a combination of its volatility, oil and water resistance, resistance to migration and heat and light stability." Concerning these properties, Old Monsanto promotes its PCB products' "low losses," "good resistance," and "negligible weight loss." by way of promoting plasticizer permanence.

117.    Old Monsanto's representations concerning PCB volatility, resistance to

30

migration, and "permanence," in the specific sense that the plasticizer components would not leave the application to which they are put, were at best misleading and deceptive because they were provided in the context of disclaiming any toxic effects of the products.

118.    Old Monsanto continued making these and similar representations regarding PCB toxicity, volatility, permanence, resistance to migration, and related properties in connection with its plasticizer product marketing in the 1950s and 1960s.

### 2.    PCB contamination at the Districts' campuses has or will make it impossible to use these buildings.

119.    As noted above, in Vermont, the screening level for PCBs in indoor air is 15 ng/m$^3$. To indicate when schools need to identify and abate potential sources of PCBs inside their buildings, the Vermont Department to Health has promulgated school-specific action levels.

120.    For grade 7 to adult (including high schools), the School Action Level ("SAL") is 100 ng/m$^3$.

121.    Vermont has determined that PCB levels of 100 ng/m$^3$ or more in high schools may present an increased lifetime cancer risk to adults of approximately 6 extra cases of cancer per million people: exposed (based on 30-year exposure duration, 9.75 hours per day and 235 days per year).

122.    Vermont's SALs are based on public health studies, PCB toxicity values established by the EPA, and EPA's and Vermont's research regarding PCB exposure levels, frequency, duration, and sources.

123.    As a result of exceedances of the Vermont SAL applicable to high schools, and to protect the health of students and employees, the certain of the Districts' school buildings

31

were shut down.

124. In addition to indoor air contamination significantly in excess of the relevant Vermont standards, PCBs were also detected in construction materials and soil on campus.

125. Testing of certain of the Districts' facilities has revealed that PCBs had migrated from window caulking, and that PCBs were also present in the floor tile glue (or mastic), which had leached into the concrete foundations and floor slabs of the buildings.

126. Had Old Monsanto adequately warned the Districts prior to construction of the School buildings, the District would not have allowed the use of construction materials with PCBs in the construction process. Had Old Monsanto adequately warned the Districts in the period following the installation of these PCB-containing building materials, the Districts could have removed these materials sooner-which would have made it far less costly for the District to remediate the schools' buildings instead of replacing them.

127. In the absence of elevated PCB concentrations in the Districts' school properties, the existing campus facilities would remain safely useable.

## FIRST CAUSE OF ACTION
## PUBLIC NUISANCE

128. Plaintiffs reallege and reaffirm each and every allegation set forth in the preceding paragraphs as if fully restated in this cause of action.

129. Defendants designed, manufactured, distributed, marketed, and promoted PCBs and PCB-containing products in a manner that created or contributed to the creation of a public nuisance that is harmful to health.

130. Defendants intentionally designed, manufactured, distributed, marketed, and sold PCBs and PCB-containing products with the knowledge that they inevitably and

32

foreseeably caused or created indoor air contamination, property damage, and unreasonable health risks when used as intended.

131.    Defendants knew that their PCBs and PCB-containing products would inevitably end up in the indoor air and surfaces, concrete foundations, and other property of the District when used as intended.

132.    Defendants' conduct and the presence of PCB contamination at the Plaintiffs' District's schools annoy, injure, and endanger the comfort, repose, health, and safety of others.

133.    Defendants' conduct and the presence of PCB contamination in Districts' properties, namely the Districts' campus facilities, interferes with and obstructs the public's safe use and comfortable enjoyment of the Districts' properties for educational and community purposes.

134.    The presence of PCB contamination in Districts' properties, namely the Districts' campus facilities, also interferes with the Districts' and their students' and staff members' interests in a safe and healthy educational environment.

135.    Defendants' conduct and the presence of PCB contamination in District property, namely the Districts' campus facilities, is injurious to human health.

136.    An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health and safety of students and staff.

137.    The seriousness of the human health risk far outweighs any social utility of Defendants' conduct in designing, manufacturing, marketing, distributing, and selling PCBs and PCB-containing products for use in building construction materials, and concealing or misrepresenting the true dangers posed to human health as a result of such use.

138.    The rights, interests, and inconvenience to the Districts and the public, including students and staff far outweighs the rights, interests, and inconvenience to Defendants, which profited heavily from the manufacture and sale of PCBs and PCB-containing products.

139.    Defendants' conduct caused and continues to cause harm to the Districts.

140.    The Districts have suffered and will continue to suffer damage from Defendants' PCBs and PCB-containing products. This harm is severe and greater than the Districts should be required to bear without compensation.

141.    Defendants knew with substantial certainty that the design, manufacture, marketing, distribution, and sale of PCBs and PCB-containing products for use in building construction materials causes the type of contamination and property damage now found in the Districts' properties, namely the Districts' campus facilities. Defendants knew that their PCBs would contaminate and damage Districts properties as a result of the ordinary and intended use of their products used in building construction materials. In addition, Defendants knew PCBs and PCB- containing products are associated with serious illnesses in humans and that humans may be exposed to PCBs through inhalation of contaminated air and contact with contaminated surfaces.

142.    In the alternative, Defendants should have known that their design, manufacture, marketing, distribution and sale of PCBs would cause the above-described harms at the Districts' campuses.

143.    This conduct was abnormally dangerous because it created a likelihood of a high degree of risk to the Districts' schools' occupants.

144.    Defendants' conduct in designing, manufacturing, distributing, selling and

34

promoting PCBs and PCB-containing products for use in building construction materials constitutes an intentional and unreasonable interference with a right common to the public, *i.e.,* the right to safely and comfortably use the Districts' properties for educational and community purposes without obstruction and health hazard. This conduct has disrupted the comfort and convenience of the general public.

145.    Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn the Districts and the public about the human health risks posed by its PCB and PCB-containing products, and each day on which they fail to do so constitutes a new injury to the Districts.

146.    The Districts suffered harm of a kind different from that suffered by members of the general public, including the costly damage to the Districts' campus facilities, which it operated and maintained for public purposes.

147.    As a direct and proximate result of Defendants' creation of a public nuisance, the Districts have suffered, and continue to suffer, monetary damages to be proven at trial.

### SECOND CAUSE OF ACTION
**PRIVATE NUISANCE**

148.    Plaintiffs reallege and reaffirm each and every allegation set forth in the preceding paragraphs as if fully restated in this cause of action.

149.    Defendants designed, manufactured, distributed, marketed, and promoted PCBs and PCB-containing products in a manner that created or contributed to the creation of a private nuisance.

150.    Defendants intentionally designed, manufactured, distributed, marketed, and sold PCBs and PCB-containing products with the knowledge that they inevitably and

35

foreseeably caused or created indoor air contamination, property damage, and unreasonable health risks when used as intended.

151.    Defendants knew that their PCBs and PCB-containing products would inevitably end up in the indoor air and surfaces, concrete foundations, and other property of the Districts when used as intended.

152.    Defendants' conduct and the presence of PCB contamination at the Districts' campuses, constitutes a substantial and unreasonable interference with the Districts' interests in the use and enjoyment of this land.

153.    An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health and safety of students and staff. This contamination constitutes an interference that far exceeds the customary interferences a land user suffers in an organized society.

154.    Defendants' conduct caused and continues to cause harm to the District. The District has suffered and will continue to suffer damage from Defendants' PCBs and PCB-containing products. This harm far exceeds the utility of Defendants' conduct in designing, manufacturing, marketing, distributing, and selling PCBs and PCB-containing products for use in building construction materials, and concealing or misrepresenting the true dangers posed to human health as a result of such use. It is a severe harm that is greater than the Districts should have to bear without compensation.

155.    Defendants were substantially certain that the design, manufacture, marketing, distribution, and sale of PCBs and PCB-containing products for use in building construction materials would cause the type of contamination and property damage at the Districts' campuses.

36

Defendants knew that their PCBs would contaminate and damage Districts' properties as a result of the ordinary and intended use of their products used in building construction materials. In addition, Defendants knew PCBs and PCB-containing products were associated with serious illnesses in humans and that humans could be exposed to PCBs through inhalation of contaminated air and contact with contaminated surfaces.

156.    In the alternative, Defendants should have known that their design, manufacture, marketing, distribution and sale of PCBs would cause the above-described invasion of the Districts' campuses. Defendants' conduct was abdominally dangerous because it created a likelihood of a high degree of risk to the Districts' schools' occupants, including school-aged children.

157.    Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn the Districts and the public about the human health risks posed by its PCB and PCB-containing products, and each day on which they fail to do so constitutes a new injury to the Districts.

158.    As a direct and proximate result of Defendants' creation of a private nuisance, the Districts have suffered, and continues to suffer, monetary damages to be proven at trial.

### THIRD CAUSE OF ACTION
### STRICT LIABILITY - DEFECTIVE DESIGN

159.    Plaintiffs reallege and reaffirm each and every allegation set forth in the preceding paragraphs as if fully restated in this cause of action.

160.    Defendants' PCB and PCB-containing plasticizer products were not reasonably safe as designed at the time the products left Defendants' control.

161.    The toxicity, tendency to volatilize and leach from their applications,

persistence, tendency to bioaccumulate, and inability of PCB compounds to be contained rendered Defendants' PCB and PCB-containing plasticizer products unreasonably dangerous at all times.

162.    Defendants' PCB and PCB-containing plasticizer products were unsafe as designed for normal handling and use. These products reached the Districts' facilities without undergoing a substantial change in condition. Monsanto's products were defective components incorporated into materials sold by others.

163.    Due to their toxicity, tendency to volatilize and leach from their applications. persistence, and inability to be contained, among other things, Defendants knew their PCB and PCB-containing plasticizer products were not safe at the time they were manufactured because, even when used as intended, such products would inevitably produce significant contamination of air or other media and significant property damage.

164.    Defendants knew their PCB and PCB-containing plasticizer products were unsafe to an extent beyond that which would be contemplated by an ordinary person because they created dangerous indoor air and surface contamination, contamination of concrete foundations, and other forms of property damage, especially of public-school buildings known to be used and occupied by vulnerable populations such as children and adolescents.

165.    Defendants designed, manufactured, distributed, sold, and promoted PCB and PCB-containing plasticizer products for use in building construction materials despite such knowledge, in order to maximize their profits.

166.    The PCB and PCB-containing plasticizer products were placed in the stream of commerce and sold by Defendants in a defective and unreasonably dangerous condition in that

they were toxic, volatile, certain to leach from their applications, persistent, and bioaccumulative. These products inevitably escaped to contaminate adjoining surfaces and materials such as concrete foundations, which resulted in extensive property damage to the District and unreasonable risks to human health.

167.   It was foreseeable to Defendants or a reasonable manufacturer that the PCBs damaging Districts' properties, namely the Districts' school campuses and facilities, would reach the Districts' property in part because Defendants promoted their PCB and PCB-containing plasticizer products for use in building construction materials.

168.   Contamination of the Districts' properties, namely the Districts' school campuses and facilities, occurred because of the defective design and manufacture of Defendants' PCB and PCB-containing plasticizer products.

169.   Defendants' PCB and PCB-containing plasticizer products caused and continue to cause injury to the District.

170.   Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn the Districts and the public about the human health risks posed by their PCB and PCB-containing plasticizer products, and each day on which they fail to do so constitutes a new injury to the Districts.

171.   The Districts have suffered and will continue to suffer damages in amounts to be proven at trial.

## FOURTH CAUSE OF ACTION
## STRICT LIABILITY-FAILURE TO WARN

172.   Plaintiffs reallege and reaffirm each and every allegation set forth in the preceding paragraphs as if fully restated in this count.

39

173.     Defendants' PCB and PCB-containing plasticizer products were not reasonably safe because they lacked adequate warnings at the time the products left Defendants' control. Defendants had a duty to provide these warnings, the lack of these warnings made their products unreasonably dangerous and defective, and Defendants knew or should have known of these dangers.

174.     At the time Defendants designed, manufactured, distributed, sold, and promoted their PCB and PCB-containing plasticizer products for use in building construction materials, Defendants knew that, even when used as intended, such products would inevitably and foreseeably produce significant indoor air and surface contamination and property damage.

175.     Despite Defendants' knowledge, Defendants failed to provide adequate warnings that their PCB and PCB-containing plasticizer products would become a danger to the Districts, their students and staff, and the public.

176.     Defendants could have warned of this certainty but intentionally concealed the certainty of contamination and property damage in order to maximize profits.

177.     Defendants concealed the dangers of their PCB and PCB-containing plasticizer products after they designed, manufactured, distributed, promoted, and sold them for use in building construction materials, and did not issue adequate warnings or instructions to those who had previously purchased their products, and thereafter continued to design, manufacture, distribute, promote and sell PCB and PCB-containing plasticizer products without adequate warnings or instructions.

178.     Without adequate warnings or instructions, Defendants' PCB and PCB-containing plasticizer products were unsafe to an extent beyond that which would be

40

contemplated by an ordinary person.

179.   Defendants knowingly failed to issue warnings or instructions concerning the dangers of PCBs and PCB-containing plasticizer products in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances.

180.   The PCB and PCB-containing plasticizer products were placed in the stream of commerce and sold by Defendants in a defective and unreasonably dangerous condition in that their design failed to include warnings or instructions sufficient and necessary for the safe and proper use of the products.

181.   It was foreseeable to Defendants or a reasonable manufacturer that the PCBs damaging District property, namely the Districts' school campuses and facilities, would reach the Districts' properties in part because Defendants promoted their PCB and PCB-containing plasticizer products for use in building construction materials.

182.   Contamination of the District's property, namely the Districts' school campuses and facilities, occurred because of the defective PCB and PCB-containing plasticizer products. To be non-defective and reasonably safe for use, the products should have contained or been accompanied by a warning as to their toxicity, persistence, bioaccumulativity, volatility, tendency to leach from their applications, and inability to be contained.

183.   Defendants' PCB and PCB-containing plasticizer products caused and continue to cause injury to the Districts.

184.   Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn the District and the public about the human health risks posed by their PCB and PCB-containing plasticizer products, and each day on which they fail to do so constitutes a new injury to the District. Even after Defendants' products were introduced

into the Districts' schools' campuses and facilities, the Defendants could have and should have issued a warning about the dangers posed by these products, which would have substantially reduced the cost of PCB remediation at these facilities.

185.    The Districts have suffered and will continue to suffer damages in amounts to be proven at trial.

## FIFTH CAUSE OF ACTION
### TRESPASS

186.    Plaintiffs reallege and reaffirm each and every allegation set forth in the preceding paragraphs as if fully restated in this count.

187.    As alleged above, Defendants designed, manufactured, distributed, marketed, and promoted PCB and PCB-containing plasticizer products in a manner that ensured that toxic PCB compounds would invade the Districts' properties, including the indoor air and surfaces, concrete foundations, and other parts of the Districts' schools' campuses and facilities.

188.    The Districts have a right of exclusive possession of the Districts' schools' campuses and facilities.

189.    As a result of such invasion, the Districts' properties, namely the Districts' schools' campuses and facilities, are contaminated by toxic PCBs. This invasion constitutes a significant physical impact on the Districts' schools' facilities—so significant that the buildings must be remediated and/or replaced.

190.    Such contamination is harmful to human health and injurious to the Districts as owner of said property. As a result of this contamination, the Districts have incurred monetary damages.

191.    Defendants intentionally designed, manufactured, marketed, and sold PCB and PCB-containing plasticizer products for use in building construction materials with the knowledge

that they would inevitably cause contamination of indoor air and surfaces, concrete foundations, and other pans the buildings in which they were incorporated, including the Districts' properties.

192.  Defendants knew that their PCBs would end up in the Districts' properties, namely the Districts' schools' campuses and facilities, when used as intended.

193.  Defendants' conduct caused and will continue to cause injury to the Districts.

194.  Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn the Districts and the public about the human health risks posed by their PCB and PCB-containing plasticizer products, and each day on which they fail to do so constitutes a new injury to the Districts.

195.  As a direct and proximate result of Defendants' trespass, the Districts have suffered, and continues to suffer monetary damages to be proven at trial.

**SIXTH CAUSE OF ACTION**
**NEGLIGENCE**

196.  Plaintiffs reallege and reaffirm each and every allegation set forth in the preceding paragraphs as if fully restated in this count.

197.  Defendants had a duty of care to protect others against unreasonable risks resulting from the use of their PCB and PCB-containing plasticizer products.

198.  Defendants breached their duty by failing to conform to the requisite standard of care when they negligently, carelessly, and recklessly designed, manufactured, formulated, handled, stored, labeled, instructed, controlled (or failed to control), tested (or failed to test), marketed, sold, and otherwise distributed toxic PCB and PCB-containing plasticizer products for use in building construction materials that contaminated the Districts' properties, namely the Districts' schools' campuses and facilities.

199.  Defendants failed to exercise ordinary care because a reasonably careful company

43

that learned of its product's toxicity would not manufacture that product, would warn of its toxic properties, or would not market and promote that product for use in applications that would inevitably jeopardize the health of persons and condition of property exposed to it as a result.

200.    Defendants failed to exercise ordinary care because a reasonably careful company that learned that its product could not be contained during normal use would not continue to manufacture that product, would warn of its dangers, or would not market and promote that product for use in applications that would inevitably jeopardize the health of persons and condition of property exposed to it as a result.

201.    Defendants failed to exercise ordinary care because a reasonably careful company would not continue to manufacture and sell or distribute PCB and PCB-containing plasticizer products for use in building construction materials m mass quantities and to the extent that Defendants did so.

202.    There is a proximate causal connection between Defendants' breach of their duty of care and the resulting harm to the Districts and their properties.

203.    Defendants' negligence caused and continues to cause injury to the Districts.

204.    Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn the Districts and the public about the human health risks posed by their PCB and PCB-containing plasticizer products, and each day on which they fail to do so constitutes a new injury to the Districts.

205.    The Districts have suffered and will continue to suffer damages in amounts to be proven at trial.

## **PRAYER FOR RELIEF**

Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1.    Damages according to proof;

2.    Punitive or exemplary damages sufficient to punish Defendants' use of fraudulent, malicious, or evil intent or actions and deter or warn others against commission of similar misconduct;

3.    Award of the past, present, and future costs to abate the ongoing public nuisance and/or to fully respond to the contamination and property damage caused by Defendants' conduct;

4.    Declaratory judgment and injunctive relief requiring Defendants to abate and/or pay for abatement of the ongoing public nuisance, including all future abatement techniques necessary to protect the public health such as demolition and removal of contaminated property and construction of replacement property;

5.    Litigation costs and attorneys' fees as permitted by law;

6.    Pre-judgment and post-judgment interest; and

7.    Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial.

Dated at Burlington, Vermont this 29th day of June, 2023.

By: _____
Pietro J. Lynn, Esq.
Lynn, Lynn, Blackman & Manitsky, P.C.
*Attorneys for Plaintiffs*
76 St. Paul Street, Suite 400
Burlington, VT 05401
802-860-1500
plynn@lynnlawvt.com