**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

| | | |
|---|---|---|
| ADDISON CENTRAL SCHOOL DISTRICT, et al. | ) ) ) ) | CASE NO. 2:23-CV-164-CR |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| MONSANTO CO., SOLUTIA, INC., and PHARMACIA LLC, | ) ) ) | |
| Defendants. | ) ) ) | |

**STATE OF VERMONT'S BRIEF AS *AMICUS CURIAE***

TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

BACKGROUND ...................................................................................................... 2

   I.   The three pending lawsuits about PCB contamination in Vermont schools....................... 2

   II.  *Addison* has caused logistical problems for the State and risks financial problems for school districts. ....................................................................................................... 5

ARGUMENT ........................................................................................................... 7

   I.   The Court should abstain under *Colorado River*. ............................................. 7

   II.  The Court should stay this action pursuant to its inherent authority. ............................... 10

      A.   Legal standard.......................................................................................... 10

      B.   The relevant factors show that this case should be stayed. ...................................... 12

CONCLUSION........................................................................................................ 18

**INTRODUCTION**

This case is duplicative of a case that the Attorney General previously filed in state court. It should be stayed to prevent inefficient, piecemeal litigation and to promote comity between the federal and state courts.  The State of Vermont's case, filed in June of this year, is a statewide lawsuit seeking damages for the costs of detecting and remediating polychlorinated biphenyls ("PCBs") in Vermont school buildings against the Monsanto companies that manufactured PCBs.  The State seeks to recover the millions of dollars appropriated by the Vermont Legislature to test and remediate Vermont schools for PCBs and any additional remediation costs to comply with regulatory standards that otherwise would be borne by the school districts.  The Vermont Legislature in 2023 appropriated $16 million for testing and remediation at schools throughout the State, expressly authorized the Attorney General to file suit against PCBs manufacturers, and established a requirement for school districts to reimburse the State for grants made from any monies recovered in litigation.  With the exception of Burlington High School ("BHS"), where the school district has issued a bond to pay for an entirely new high school, to date the costs of addressing PCB contamination at all other Vermont schools have been covered by the legislative appropriations.

Despite the State's comprehensive suit addressing PCBs in schools statewide, this federal lawsuit on behalf of approximately ninety school districts was filed a few weeks after the State filed its case.  There are thus now two overlapping cases pending in state and federal courts seeking damages for PCBs testing, investigation, and remediation costs in many of the same schools.  If nothing is done, the parallel litigation in this Court and in Superior Court will cause a massive duplication of effort, conflicts in approach, court rulings on the same issues in different courts (with the potential for strategic gameplay), and a race to judgment.   Many federal courts

1

faced with similarly duplicative state-federal cases have stayed the federal action.  The State respectfully requests that the Court do the same here.

## BACKGROUND

I.   **The three pending lawsuits about PCB contamination in Vermont schools.**

In 2021, the Vermont legislature required the Department of Environmental Conservation to test for airborne PCBs at all Vermont schools constructed or renovated prior to 1980 and allocated $5 million for this purpose.  *See* Act 74, §§ E.709.1(a), B.1106(a)(3) (2021).[1]  Over thirty percent of the schools tested so far have airborne PCB concentrations above the "School Action Levels" (SAL) set by the Department of Health to protect students and staff and will be required under state law to investigate the sources of PCBs, remove PCBs, and/or take other remediation steps to reduce PCBs in the indoor air.  The SALs (expressed in nanograms per cubic meter) are 30 for pre-kindergarten, 60 for kindergarten to Grade 6, and 100 for Grade 7 to adult.[2]  The State has also set "Immediate Action Levels" that are three times higher than each of the three SALs; rooms at or above these levels must be immediately taken out of use.  Where testing has revealed concentrations of PCBs in a school within 25% of the applicable SAL, quarterly sampling is required to ensure concentrations do not fluctuate above the SAL.  The State reimburses these costs.

---

[1] The text of Act 74 is available at
https://legislature.vermont.gov/Documents/2022/Docs/ACTS/ACT074/ACT074%20As%20Enacted.pdf.

[2] Agency of Natural Resources; PCBs in Schools (testing results), *available at* https://anrweb.vt.gov/DEC/PCBPublic/Home.aspx; Vermont Department of Health, PCBs in Indoor Air of Schools, Development of School Action Levels (Sept. 2023) (SALs), *available at* https://www.healthvermont.gov/sites/default/files/documents/pdf/ENV-PCB-school-action-level-development.pdf.

In June 2023, the legislature enacted Act 78, which requires the Department of
Environmental Conservation ("DEC") to complete PCB testing in schools by July 2027.  *See* Act
78, § C.111.[3]  Act 78 also appropriates $16 million for grants to school districts for PCB
investigation, removal, and remediation at schools with test results above the SAL other than
BHS, and an additional $16 million for BHS.[4]  *See* Act 78, § C.112(a) & (b) (2023).  Under the
statute, grants to school districts "shall be in an amount sufficient to pay for 100 percent of the
school's investigation, remediation, or removal costs required" by the State, including costs to
temporarily relocate students.  *Id*. § C.112(b).  School districts that received grants under prior
legislation for 80 percent of such costs are to be paid the remainder.  *Id*.  As far as the State is
aware, these legislative grants to school districts have sufficed to cover virtually all costs that
Vermont school districts have incurred related to PCB investigation, removal, and remediation.

Act 78 also includes a "State Action" section, which says that the State may recover
testing and cleanup costs from PCB manufacturers.  *Id*. § C.112(d).  Monsanto was virtually the
sole domestic manufacturer of PCBs.[5]  Finally, Act 78 requires school districts to reimburse the

---

[3] The text of Act 78 is available at https://ljfo.vermont.gov/assets/Uploads/616a60f852/Act-78-As-Enacted.pdf.

[4] After the discovery of PCBs in Burlington High School ("FBSD"), BSD razed the BHS buildings and commenced building a new high school at a cost of approximately $190 million. In 2022, BSD's voters approved issuing $165 million in bonds for this purpose; BSD has estimated that its carrying cost on this debt could reach as much as $11.6 million per year.  *See* Burlington School District, Voters Approve Bond to Build New High School and Technical Center in Vermont's Queen City (Nov. 8, 2022), *available at* https://www.bsdvt.org/2022/11/08/voters-approve-bond-to-build-new-high-school-and-technical-center-in-vermonts-queen-city/; Burlington School District, BHS/BTC Estimated Tax Impacts, *available at* https://www.bsdvt.org/wp-content/uploads/2022/09/BHS_BTC-2025-Tax-Implications.pdf ("high-end estimate[]" of $11.6 million to service $165 million in bonds).

[5] Although defendants recently began referring to themselves collectively as "Pharmacia," apparently on the theory that Pharmacia LLC is the only successor to the original Monsanto Company, the State follows the virtually universal convention in PCB tort cases of referring to the three successors to the original Monsanto Company (including a new company also called "Monsanto Company") collectively as "Monsanto."  *See Bailey v. Monsanto Co.*, 176 F. Supp.

State in the event the school districts obtain a recovery in litigation, in the amount of the grant or in the amount of the litigation recovery, whichever is less.  *Id.* § C.112(c).

**The three cases.**  Three lawsuits have been filed to recover for property damage caused by PCB contamination in Vermont schools:

- In 2021, after the discovery of PCBs in Burlington High School ("BHS"), Burlington School District ("BSD") brought a lawsuit against Monsanto in federal court to recover the cost of replacing BHS.  *See Burlington Sch. Dist. v. Monsanto Co.*, No. 2:22-CV-215-WKS (D. Vt. filed Dec. 9, 2022) ("*BSD*").  BSD alleges damages in excess of $190 million.

- In June 2022, the State, with the Attorney General as lead counsel and assisted by the same outside legal team that represents BSD, filed suit against Monsanto in Chittenden County Superior Court.  *See State v. Monsanto Co.*, No. 23-CV-02606 (the "State's lawsuit").  The State's lawsuit seeks recovery for PCB contamination in natural resources such as Lake Champlain and for PCBs in public and independent Vermont schools other than BHS.  The school-related costs sought by the State include: (1) costs borne directly by the State, including the millions of dollars in legislative appropriations, which the State seeks in its proprietary capacity, and (2) costs (if any) that may ultimately be borne by the school districts themselves, which the State seeks in its *parens patriae* capacity.  The State expressly excluded damages relating to BHS from its case.  The operative complaint in the State's lawsuit is attached to this amicus brief as Exhibit 1.

- A few weeks after the State filed its lawsuit and approximately a week after enactment of Act 78, the complaint in this action was filed on behalf of 91 school districts, one junior high school board, and one independent school in Vermont ("*Addison*").  The *Addison* complaint repeats almost verbatim many of the allegations and all the causes of action from the *BSD* complaint.  The *Addison* plaintiffs represent approximately three-quarters of all school districts in Vermont.

The *Addison* complaint pleads six causes of action (public and private nuisance, trespass, design defect, failure to warn, and negligence).  The State's lawsuit pleads those same common law causes of action, a statutory claim related to water contamination, and two school-related statutory claims under statutes that authorize only the State to sue: a strict liability claim under

---

3d 853, 868 (E.D. Mo. 2016) (describing contractual relationship among corporate successors and finding evidence of direct liability of new Monsanto Company).

the Vermont Waste Management Act, which has new provisions specifically addressing PCBs in schools and manufacturer liability, 10 V.S.A. §§ 6615(a)(5), 6602(17), and  a claim under Act 78's "State Action" provision, Act 78, § C.112(d) (2023).  *See* Exh. 1, ¶¶ 287-307 (FAC). Unlike *Addison*, the State's prayer for relief seeks civil penalties under the Waste Management Act.

**The progress of the three lawsuits.**  Of the three cases, *BSD* is furthest along.  Judge Sessions recently denied Monsanto's motion to dismiss.  *See Burlington Sch. Dist. v. Monsanto Co.,* 2023 WL 4175344 (D. Vt. June 26, 2023).  The *BSD* parties are in discovery, and Judge Sessions has set a trial-ready date of July 1, 2024.  *See BSD*, First Amended Discovery Schedule/Order (Dkt. 31), ¶ 15.  In *Addison*, briefing on Monsanto's motion to dismiss is set to be completed today.  In the State's lawsuit, the State recently amended its complaint and Monsanto will file its response by November 13.

**Monsanto's Addison subpoenas.**  Monsanto is using *Addison* to conduct extensive third-party discovery of the State.  It has served one subpoena out of *Addison* on DEC and seven subpoenas each containing more than 40 requests on DEC contractors carrying out initial air tests in Vermont schools, as well as two subpoenas requesting materials from DEC-contracted laboratories analyzing Vermont school environmental contaminant samples.  As of this writing, the State and its contractors have produced at least 170,000 pages of documents to Monsanto in response to these *Addison* subpoenas.  These subpoenas have placed significant administrative and logistical burdens on the State, environmental contractors, and laboratories.

II.    **_Addison_ has caused logistical problems for the State and risks financial problems for school districts.**

The State and the *Addison* plaintiffs have attempted, through discussions among counsel, to minimize conflict between the parallel lawsuits.  But they already have run into conflicts that

5

have caused delays and logistical problems in DEC's administration of the legislatively mandated statewide PCBs testing program. For example, in response to motion practice by Monsanto in this Court, the *Addison* plaintiffs stipulated to certain rules governing Monsanto's access to testing events. *See* Dkt. 25. At the time, counsel for *Addison* declined to accept certain changes to the stipulation requested by the State to help avoid delays in the State's testing schedule. Since then, the *Addison* plaintiffs have declined the State's request to develop a single stipulation with Monsanto covering all Vermont schools. This has been a significant problem for DEC, because the *Addison* stipulation requires that Monsanto be given 4 weeks' notice of testing, and the State was not provided sufficient notice or opportunity to refuse rescheduling requests. Although counsel for the *Addison* plaintiffs has recently agreed to notify and seek approval from the State for rescheduling testing, initial air testing was rescheduled at two schools to accommodate Monsanto's insistence on four weeks' notice. The *Addison* stipulation also appears to forbid schools from undertaking almost any remediation or changes to ventilation in response to a SAL exceedance until Monsanto has had a chance to inspect the school again. The State is concerned that this provision could extend the time that building occupants are exposed to PCBs above the SAL.

The State is also concerned about the impact of a contingency fee in *Addison* on school districts' finances. *Addison* counsel are reportedly charging a 33 percent contingency fee.[6] Depending on the terms of the fee agreement, the *Addison* schools could be obligated to pay the full amount of their recoveries to the State while still paying legal fees to counsel—meaning these school districts could have a net *negative* recovery. While 33% may not be unusual in

---

[6] *See* Susan Smallheer, *Attorney Explains Monsanto Lawsuit, After the Fact,* Brattleboro Reformer (Aug. 17 2023), *available at* https://www.reformer.com/local-news/attorney-explains-monsanto-lawsuit-after-the-fact/article_8b458cea-3d0d-11ee-974f-1b76b951b625.html.

some contingency-fee arrangements, it is more than the State has contracted for with its outside counsel (*i.e.*, a graduated fee of up to 20 percent), meaning that a larger portion of any *Addison* recovery would go to legal fees than in the State's case.

## ARGUMENT

The State requests that the Court stay *Addison* pending resolution of the State's parallel action in Superior Court. The pendency of redundant federal litigation presents a substantial obstacle to a statewide resolution of Monsanto's PCB liability in the State's lawsuit, and thus this Court should abstain under the *Colorado River* doctrine. In the alternative, the Court should issue a stay pursuant to its inherent authority.

## I.     The Court should abstain under *Colorado River*.

The Court should postpone the exercise of jurisdiction by issuing a stay of *Addison* under the abstention doctrine of *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817-18 (1976). A federal court "may abstain from exercising jurisdiction when parallel state-court litigation could result in comprehensive disposition of litigation and abstention would conserve judicial resources." *Lefrancois v. Killington/Pico Ski Resort Partners, LLC*, 2019 WL 6970944, at *5 (D. Vt. Dec. 19, 2019) (internal quotation marks omitted). *Colorado River* abstention is appropriate if the two proceedings are "parallel," and where six factors on balance show that the case presents exceptional circumstances warranting abstention. *Id.* at *5-6.

First, this action is parallel to the Superior Court action, because "there is a substantial likelihood that the state litigation will dispose of all claims in the federal case." *Lefrancois*, 2019 WL 6970944, at *5 (quotation marks omitted). The Superior Court action is, if anything, broader than *Addison*. To be sure, *Addison* includes many school districts in Vermont, but the State has *parens patriae* standing to represent *all* injured school districts throughout the State.

7

Specifically, the *parens patriae* doctrine authorizes the State to sue to address injuries to "quasi-sovereign" interests, such as the State's interest in the "health and well-being" of a "substantial segment" of the Vermont population—and PCB contamination across dozens of Vermont school districts affecting thousands of Vermont children is plainly such an interest.[7]  Accordingly, unlike the *Addison* plaintiffs, the State has *parens patriae* authority to recover funds on behalf of school districts statewide.

The State's lawsuit is also broader because it has more claims—*i.e.*, all the causes of action that *Addison* has, plus two statutory causes of action unique to the State.  And while the *Addison* plaintiffs apparently intend to seek damages based on cleaning up schools beyond the level required to comply with the SAL (including in schools that have not had a SAL exceedance), in practical terms it is highly speculative whether any *Addison* school districts would elect to pursue remedies that could result in major construction/demolition projects in school buildings that are safe to occupy under state guidelines.  None of the *Addison* school districts involved in the statewide testing program has, to the State's knowledge, embarked on PCBs remediation other than where there is an SAL exceedance; those *Addison* schools that *are* engaged in remediation are submitting plans to DEC aimed at complying with the SALs. The bottom line is that because "absolute congruency is not necessary," and because "there is a

---

[7] *See Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 607 (1982); *accord Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 215 (2d Cir. 2013); *see also People v. Mid Hudson Med. Grp., P.C.*, 877 F. Supp. 143, 149 (S.D.N.Y. 1995) (New York Attorney General had *parens patriae* standing to bring claims against clinics that failed to provide sign language interpreters to deaf patients, even though individual patients could obtain complete relief through private suit).  Although the State and the school districts are not identical parties, the State's *parens patriae* authority here to seek damages suffices to make the two actions parallel for purposes of *Colorado River*; "perfect symmetry of parties" and "absolute congruency" are not required.  *See Lefrancois*, 2019 WL 6970944, at *5 (brackets and quotation marks removed).

substantial likelihood that the state litigation will dispose of all claims in the federal case," this action is plainly "parallel" to the State's lawsuit in the Superior Court. *Lefrancois*, 2019 WL 6970944, at *5-6 (quotation marks omitted).

Second, the six factors on balance favor abstention.

- The first factor looks at whether there is a res over which one of the courts has assumed jurisdiction. Here, although the tort damages are not a res, the plaintiffs in both cases are dealing with real properties where there is testing and remediation occurring in real time. The *Addison* case already has created problems over the administration of a statewide regime to test these properties; the question of control over the communications and interactions with Monsanto with respect to its observation and testing of school properties will continue for years. The state court previously assumed jurisdiction over these issues relating to real property and thus this case is similar to cases involving a res.

- The second factor is the convenience of the parties. Both trial courts are located in Burlington. If there are interlocutory appeals, Montpelier is more convenient for the parties than New York City. This factor is either neutral or modestly supports abstention.

- The third factor is whether abstention would vindicate the "clear federal policy of avoidance of piecemeal litigation." *Lefrancois*, 2019 WL 6970944, at *7 (quotation marks omitted). This factor is "by far the most important," *id.* (quotation marks omitted), and it overwhelmingly favors abstention. All the claims in both cases arise under state law, which are "peculiarly appropriate for comprehensive treatment" in state court. *Id.* (quotation marks omitted). Moreover, the *Addison* plaintiffs are seeking to vindicate the same claims at issue in the Superior Court action, which means there is the "serious potential for spawning an unseemly and destructive race to see which forum can resolve the same issue first"—an outcome that "would be prejudicial, to say the least, to the possibility of reasoned decisionmaking by either forum." *Id.* (quotation marks omitted). If *Addison* moves forward in parallel with the Superior Court action, Monsanto could attempt to make collateral estoppel arguments (even if unavailing) against the State. Moreover, if the two cases proceed in parallel, the plaintiff(s) in each case would have an incentive to settle with Monsanto before the plaintiff(s) in the other case could do the same—a dynamic that would allow Monsanto to play the plaintiffs against one another. Here as in *Lefrancois*, the threat of piecemeal litigation strongly favors abstention.

- The fourth factor is the order in which the proceedings were filed and advancement in the fora. This factor favors abstention: the Superior Court action was filed first.

- The fifth factor is the presence of federal issues. Here, where the claims in both cases "are ground[ed] entirely in state law," and some of these state-law issues may be "complex," this factor weighs in favor of abstention. *Lefrancois*, 2019 WL 6970944, at *8 (quotation marks omitted).

- The sixth factor requires the Court to determine "whether the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties." *Lefrancois*, 2019 WL 6970944, at *8 (internal quotation marks omitted). This factor also strongly favors abstention because the *Addison* plaintiffs "raise only state law claims." *Id.* More fundamentally, the Superior Court action is a significantly broader case, in that it includes all schools tested for PCBs, as well as additional causes of actions and civil penalty requests that are unique to the State. Resolution of the Superior Court action could actually resolve the entire litigation, but *Addison* cannot do so given the State's more comprehensive case. The most "adequate vehicle for the complete and prompt resolution" of PCB contamination in Vermont schools is the State's case.

This case is thus like *Lefrancois*, where this Court decided to abstain based on the order in which the proceedings were filed, the absence of federal issues, the more comprehensive nature of the state court proceedings, and above all the serious threat of piecemeal litigation.

To be sure, *BSD* will be moving forward in federal court even if *Addison* is stayed, but *BSD* is different. It was filed before the State's case and is significantly more advanced. It has a trial-ready date of July 2024, whereas *Addison* and the State's case encompass schools that likely will not be tested until 2027. Further, *BSD* involves one school versus *Addison*'s numerous overlapping schools and thus any threat of piecemeal litigation is slight.

*Addison* will result in piecemeal litigation and creates innumerable opportunities for conflicts in strategy, conflicting rulings, and severe logistical problems in the resolution of complex dispute on a matter of statewide public health and welfare. The Court should abstain from hearing it until the Superior Court action has reached conclusion.

## II.  The Court should stay this action pursuant to its inherent authority.

### A. Legal standard.

Even if the Court were to conclude that granting a stay under *Colorado River* abstention were not warranted here, the Court nonetheless could and should take action to avoid duplicative litigation. The Court has inherent power to stay this action—a step many federal courts have

taken *sua sponte* even after declining to abstain under *Colorado River*. The Second Circuit itself has done so. *Giulini v. Blessing*, 654 F.2d 189, 193-94 (2d Cir. 1981) (*Colorado River* abstention was unwarranted, but *sua sponte* remanding with directions to stay federal proceedings to "avoid[] wasteful duplication of judicial resources" and obtain "the benefit of the state court's views"); *see also Landis v. North American Co.*, 299 U.S. 248, 254 (1936) (Cardozo, J.) ("the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants").[8]

In deciding whether to issue such a stay, courts consider seven factors: (1) comity; (2) judicial efficiency; (3) the adequacy and extent of relief available in the alternative forum; (4) identity of parties and issues in both actions; (5) the likelihood of prompt disposition in the alternative forum; (6) the convenience of the parties, counsel, and witnesses; and (7) the possibility of prejudice to a party as the result of the stay. *Windward Bora*, 2020 WL 7042761, at *7. As described below, analysis of these factors strongly favors staying this action until the State's lawsuit in the Superior Court concludes.

---

[8] For other cases where courts rejected abstention but stayed litigation in deference to parallel state-court proceedings, *see Lafont v. Phillip*, 2022 WL 2132992, at *7 (E.D.N.Y. June 14, 2022) (denying *Colorado River* abstention but issuing stay *sua sponte*; motion to dismiss denied without prejudice); *Windward Bora, LLC v. Bank of New York Mellon*, 2020 WL 7042761, at *7 (E.D.N.Y. Nov. 30, 2020) (same); *Glenclova Investment Co. v. Trans-Resources, Inc.*, 874 F. Supp. 2d 292 (S.D.N.Y. 2012) (rejecting *Colorado River* abstention but *sua sponte* staying case as a "compromise," pending resolution of broader case in state court); *Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, 2011 WL 13261585, at *2 (S.D.N.Y. Nov. 3, 2011) (denying *Colorado River* abstention but issuing stay *sua sponte*); *cf. Leber-Krebs, Inc. v. Inc. v. Clinton*, 517 F. Supp. 593, 596 (S.D.N.Y. 1981) (granting defendant's motion for stay pending resolution of parallel state court action).

**B. The relevant factors show that this case should be stayed.**

**1. Comity.**

Comity strongly favors staying this action, for four reasons.

**_First_,** the claims in this case and in Superior Court all turn on state law.  As many courts have recognized, comity favors staying parallel federal litigation where state-law issues can be left to state courts to adjudicate in the first instance.  _See Lafont_, 2022 WL 2132992, at *7; _Windward Bora_, 2020 WL 7042761, at *7.

**_Second_**, the State's case was first filed.  As a matter of comity, the Court can and should take into account which case was filed first, particularly where the second lawsuit seeks to carve out a large portion of the first-filed case.[9]

**_Third_**, the State is not an ordinary plaintiff.  _Addison_ threatens to transfer adjudication of an issue of vital importance to the people of Vermont to a federal court, notwithstanding the impossibility of the State's intervention in this action, and notwithstanding the solicitude that federal law typically shows for a sovereign's right to litigate state-law matters in its own courts. _Cf. Franchise Tax Bd. v. Constr. Laborers Vacation Trust_, 463 U.S. 1, 22 n.22 (1983) ("considerations of comity make us reluctant to snatch cases which a State has brought from the

---

[9] The first filed rule has been applied as between state and federal courts.  _Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu_, 675 F.2d 1169, 1174 (11th Cir.1982) ("the court initially seized of a controversy should be the one to decide the case.... It should make no difference whether the competing courts are both federal courts or a state and federal court with undisputed concurrent jurisdiction.") (citations omitted); _United Artists Theatre Circuit, Inc. v. FCC_, 147 F.Supp.2d 965, 979 n. 12 (D. Ariz. 2000) (first-filed rule "is no less applicable when the courts set in competition against each other are a federal court and a state court."); _Commercial Union Ins., Cos. v. Torbaty_, 955 F. Supp. 1162, 1163 n. 1 (E.D. Mo. 1997) ("Typically, the first-filed rule is applied when an action is filed in two federal courts. However, the rule is applied with equal force when an action is filed in federal court and state court.").

courts of that State, unless some clear rule demands it").[10]  Comity counsels strong

countermeasures against such an attempt.

  **Fourth,** there is the potential for conflicting rulings.  For example, the two courts may

issue conflicting rulings on the merits—and if they do, issue preclusion could be raised

depending on the circumstances and the party against whom it is asserted.  As this Court has

pointed out, "since a judgment by either court would ordinarily be res judicata in the other, the

existence of such concurrent proceedings creates the serious potential for spawning an unseemly

and destructive race to see which forum can resolve the same issue first"—an outcome that

"would be prejudicial, to say the least, to the possibility of reasoned decisionmaking by either

forum."  *See Lefrancois*, 2019 WL 6970944, at *7 (quotation marks and brackets omitted).

  Parallel litigation would also put significant pressure on the State and the *Addison*

plaintiffs to settle first, thus potentially lowering settlement value.  This is because the first party

to settle could potentially preclude the other party from recovering for the schools covered by

that settlement.  This dynamic unfairly benefits Monsanto, because it can play off the two

plaintiff groups and settle with whoever will take less.[11]  If such a settlement attempted to

preclude litigation by the other plaintiff group for the schools covered by the settlement (a

provision Monsanto would no doubt insist upon), this could create additional litigation about

whether such a settlement provision is enforceable.

---

[10] Even if the State did not want to litigate this matter in its own courts (which it does), the State could not intervene in this action because it would destroy the only ground of subject matter jurisdiction, *i.e.*, diversity.  *Hood v. F. Hoffman-La Roche, Ltd.*, 639 F. Supp. 2d 25, 33 (D.D.C. 2009).

[11] *Cf. Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 282 (7th Cir. 2002) (Posner, J.) (describing "reverse auctions"  in which "the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant").

And parallel litigation would lead to duplication and conflicting outcomes even on non-merits matters, such as discovery disputes. For example, Monsanto has issued subpoenas to the State and seven of its contractors under the *Addison* action, all before the State's deadline to respond to similar document requests propounded by Monsanto in the State's action. When disputes develop about what documents a party must produce pursuant to the outstanding subpoenas and document requests, Monsanto could choose among the two courts to pick the one it deems most likely to resolve the dispute in its favor, or simply get a second bite at the apple for documents that the first court declined to require the custodian to produce.

In short, parallel litigation in this Court and the Superior Court creates an almost unlimited potential for conflict and gaming the courts; it is not an effective way to litigate or adjudicate cases as significant and complex as these. Comity strongly favors staying this action pending resolution of the State's lawsuit in the Superior Court.

### 2. Judicial efficiency.

If *Addison* is not stayed, this Court and the Superior Court will have to duplicate all the work involved in presiding over two cases, starting with motions to dismiss. *Cf. Windward Bora*, 2020 WL 7042761, at *7 (motion to dismiss was "denied without prejudice and may be renewed if the stay is lifted"). Discovery of the State and of Monsanto will occur both in state court and in this Court, a process that already has begun in part, with Monsanto peppering the State and its contractors engaged in PCBs testing with subpoenas. In addition, a final judgment in the Superior Court action will likely obviate or at least greatly diminish any additional proceedings in this Court. But there is almost no chance that a final judgment in this action would completely cut off further litigation in the Superior Court. This is because the Superior Court action has more claims and seeks relief on behalf of school districts statewide. In short, by

14

far the most efficient outcome is to stay this action so that the State's more comprehensive lawsuit can be adjudicated once and for all in the Superior Court.   This factor strongly supports a stay.

### 3.  Adequacy and extent of relief available in the Superior Court.

More relief is available in the Superior Court than in this Court.

***First****, Addison* does not seek any relief at all for roughly two dozen school districts, whereas the State's lawsuit is statewide in scope.  A similar situation came up in *Glenclova*, where the state court lawsuit sought relief on behalf of all the relevant claimants, some of whom were missing from the federal case.  The federal court stayed the federal action because it had "no interest in determining only half of the host of claims raised" in the state court action.  *See Glenclova*, 874 F. Supp. 2d at 313.  Here as in *Glenclova*, only the state-court lawsuit has the potential to afford relief to all injured parties.

***Second***, there are some costs of doing business that could negatively affect the *Addison* plaintiffs.  Act 78, which was enacted prior to the filing of *Addison*, requires the *Addison* plaintiffs to reimburse the State the lesser of "the amount of the recovery or the amount of the grant awarded to the school district."  *See* Act 78, § C.112(c) (2023).  Depending on the terms of their contingency agreement, between their contingency fee and the statutory obligation to reimburse the State (which has so far paid for all testing and remediation costs), the *Addison* plaintiffs could end up owing money to their lawyers out of their own pocket.

***Third***, the State's two school-related statutory causes of action are unique to the State and thus cannot be addressed in *Addison*.

***Fourth***, in the event existing state funding is insufficient to cover remediation costs for schools to come into compliance with the SAL, the State seeks to recover the difference in its

case. The State, working with the Legislature, expects to reimburse out of its tort recovery (likely after reimbursement of the State's appropriations and net of fees and costs) any expenditures made by a school district to come into compliance with SALs for PCBs, to the extent the contamination at issue was a basis for the damages and subject to any legislative approvals that might be needed. To be sure, *Addison* purports to seek more relief at some schools than the State's lawsuit, *i.e.*, at schools where there is no SAL exceedance or to re-remediate after SAL compliance is achieved.[12] But the State, acting through the Attorney General, can take appropriate action to ensure a fair statewide approach to damages that considers the interest of all school districts. Moreover, as a practical matter, at this juncture it seems highly doubtful that school districts will embark on potentially costly remediation projects not required by state law. If there are school districts in *Addison* that intend to engage in additional remediation, the State will consider case-by-case circumstances that might justify such an approach in the state court case; the stay requested here is intended to preserve their rights in any event. Further, in the event a school is below the SAL, the Agency of Natural Resources will continue to engage schools to undertake voluntary monitoring and will respond to any exceedances of the SAL by working with schools to develop effective remediation strategies that are protective of human health and the environment. At this point it is speculation to assume that *Addison* would result in greater relief than what the State is likely to get in the Superior Court.

---

[12] *See* Plaintiffs' Memo. in Opp. to Defendants' Motion to Dismiss (Dkt. 53) at 3 ("Notably, nowhere in the Complaint do Plaintiffs limit the redress they seek to buildings where PCB levels exceed 100 ng/m$^3$."); *id*. at 14 ("while smaller concentrations of PCBs may not trigger mandatory remediation pursuant to the dictates of the Department of Health, that does not mean toxic PCBs are not present, are not causing harm and/or are not in need of remediation or abatement.").

16

The State lawsuit holds the greatest promise for recovering adequate relief to Vermont schools. This factor strongly supports staying this action.

### 4. Identity of parties and issues in both actions.

As noted above, the State's Superior Court action presents the best route for providing statewide relief to Vermont schools as a whole, including two statutory claims that the *Addison* plaintiffs cannot bring in this (or any other) Court. This Court like others faced with similar situations should have "no interest in determining only half of the host of claims raised" in the state court action. *See Glenclova*, 874 F. Supp. 2d at 313. Because the Superior Court lawsuit encompasses all schools and issues, this factor supports staying this action in favor of more comprehensive proceedings in the Superior Court.

### 5. Likelihood of prompt disposition in Superior Court.

DEC is not expected to complete its initial round of air testing until ~July 2027; only at that point will anyone have a complete list of Vermont schools with airborne PCB contamination and only then will it be known which schools test above or below the SAL. Practically speaking, neither this action nor the Superior Court action can proceed to judgment until this information is available. The odds of a prompt disposition are low in either court, so this factor is neutral.

### 6. Convenience of the parties, counsel, and witnesses.

As noted above, if this action is stayed, the Superior Court proceedings likely will result in what is effectively a final resolution of both cases. This efficiency constitutes an enormous

benefit to parties, counsel and witnesses, who otherwise will have to deal with two proceedings rather than one.  This factor strongly supports a stay.

### 7.  Possibility of prejudice to a party as the result of the stay.

A stay would not prejudice the *Addison* plaintiffs.  Staying this action would end the race to judgment that would otherwise afflict the parties in both courts, would avoid conflicting and duplicative court decisions on the same issues, and would simplify potential settlement discussions.  Because the State seeks to recover full funding for schools to remediate to comply with the SAL there is little risk that school districts will recover less from the Superior Court action than from *Addison* for that remediation.  The schools will also benefit from discovery coordinated by a single court, and from a unified stipulation governing Monsanto's school inspections throughout Vermont.  In the event a school district would want to proceed on a claim for additional remediation costs after the Superior Court action has been litigated to conclusion, the State's intention is that it should be free to resume litigation at that point in this Court.  All in all, there is little—perhaps nothing—to be lost and much to be gained from staying this action.

### CONCLUSION

Pursuant to *Colorado River* and/or the Court's inherent power to stay litigation, the State respectfully requests that the Court stay this action pending resolution of the State's Superior Court action.

18

November 3, 2023                    STATE OF VERMONT

                                   CHARITY R. CLARK
                                   ATTORNEY GENERAL


                                   Justin E. Kolber
                                   David G. Golubock (*admission application forthcoming*)
                                   Assistant Attorneys General
                                   Office of the Attorney General
                                   109 State Street
                                   Montpelier, VT 05602
                                   (802) 828-3186
                                   Justin.Kolber@vermont.gov
                                   David.Golubock@vermont.gov