UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2024 SEP 30 PM 3: 29

BY _____
CLERK
DEPUTY CLERK

ADDISON CENTRAL SCHOOL DISTRICT,   )
*et al.*,                          )
                                   )
    Plaintiffs,               )
                                   )
    v.                        )    Case No. 2:23-cv-00164
                                   )
MONSANTO CO.; SOLUTIA, INC.; and   )
PHARMACIA LLC,                     )
                                   )
    Defendants.               )

**OPINION AND ORDER DENYING
DEFENDANTS' MOTION TO DISMISS**
(Doc. 47)

The pending case arises out of the manufacture and sale of products containing polychlorinated biphenyls ("PCBs") by Defendants Monsanto Co., Pharmacia LLC, and Solutia, Inc. (collectively, "Defendants"), which Plaintiffs, a group of ninety-two school districts and one independent school in Vermont, used in the construction of school buildings prior to 1980. Plaintiffs seek to recover past, present, and future costs, losses, and damages associated with the presence of PCBs in their properties. They assert claims of public nuisance (Count I), private nuisance (Count II), strict liability for defective design (Count III), strict liability for failure to warn (Count IV), and trespass (Count V).[1]

On August 23, 2023, Defendants moved to dismiss seventy-nine Plaintiffs from the Complaint for lack of standing.[2] At oral argument, Defendants revised this allegation and now assert that seventy-six plaintiffs lack standing. Defendants additionally seek the dismissal of Plaintiffs' private nuisance, public nuisance, and trespass claims pursuant to

---

[1] After Defendants filed the instant motion, Plaintiffs filed an amended Complaint, (Doc. 112), wherein Plaintiffs assert an additional claim for negligence (Count VI).

[2] At oral argument, Defendants revised this allegation and now assert that seventy-six plaintiffs lack standing.

Fed. R. Civ. P. 12(b)(6). (Doc. 47.) On October 6, 2023, Plaintiffs opposed the motion to dismiss, (Doc. 53), and Defendants replied on November 3, 2023. (Doc. 58.) On February 27, 2024, the court held a hearing on Defendants' motions, at which time the court also addressed the State of Vermont's motion to file an amicus brief and potential intervention. (Doc. 57.) The State of Vermont recently moved for reconsideration of the court's decision not to stay this case. (Doc. 117.) That motion is not ripe for adjudication.

Plaintiffs are represented by Gregory J. Pals, Esq.; J. Grant LaBar, Esq.; Pietro J. Lynn, Esq.; R. Preston Sifton, Jr., Esq.; T. Roe Frazer, II, Esq.; Thomas Roe Frazer, III, Esq.; and William Blair, Esq. Defendants are represented by Alexandra L. Nelson, Esq.; Devin T. McKnight, Esq.; Douglas J. Moore, Esq.; Emyr T. Remy, Esq.; Hanna C. Waite, Esq.; Ian P. Carleton, Esq.; Quentin F. Urquhart, Jr., Esq.; and Stephen I. Hansen, Esq.

I.      **Factual Allegations in the Complaint.**

A.      **Defendants' Manufacture of PCBs.**

Defendants are the successors in liability of Monsanto Company ("Old Monsanto"). From 1929 to 1977, Old Monsanto manufactured, marketed, sold, and distributed PCBs, which are synthetic organic chemical compounds with no known natural source. Old Monsanto's PCBs were used in construction materials and plasticizer applications such as caulking, glazing, sealants, and flooring adhesives. Plaintiffs assert that Old Monsanto expressly manufactured and promoted its PCB products for use in construction and thus knew its products would be used in the construction of schools and other buildings frequented by children and adolescents.

Old Monsanto allegedly knew, as early as 1937, that PCBs were toxic to humans and would eventually contaminate nearby air, surfaces, and materials. Notwithstanding this knowledge, Old Monsanto allegedly made representations that PCBs would not significantly off-gas, migrate, or leach when promoting its PCB plasticizer products for use in construction materials, even though there were safer alternatives for the same or similar uses. Plaintiffs assert that Old Monsanto purposefully avoided undertaking

additional studies in the 1950s and 1960s because it knew the studies would likely demonstrate the dangers associated with PCBs and the likelihood PCBs could contaminate indoor air. They contend that Old Monsanto continued to deceive consumers and end-users about the dangers associated with PCBs after certain of Plaintiffs' facilities and buildings were constructed.

In 1971, Old Monsanto withdrew its PCB formulations intended for use in plasticizers and similar applications but allegedly did not inform end-users of this decision or advise them to take steps to mitigate damage caused by PCBs. In 1980, Old Monsanto stopped manufacturing PCBs but allegedly continued to deny or conceal the extent of their potential danger to humans.

**B.    Plaintiffs.**

Plaintiffs are Vermont municipal corporations that own and operate school buildings and facilities allegedly contaminated with "dangerously elevated concentrations" of PCBs due to the use of construction materials made with Old Monsanto's products. (Doc. 1 at 12, ¶ 2.) They contend PCBs have been detected in construction materials, soil, and indoor air on their campuses. "As a result of exceedances of the Vermont [school action level] applicable to high schools, and to protect the health of students and employees, [Plaintiffs] need to monitor the levels of PCBs in school buildings" and review options for remediating and replacing contaminated buildings and facilities. *Id.* at 14, ¶ 12. Such remediation and replacement efforts could lead to shutting down affected school buildings. Both temporary and permanent arrangements will allegedly be difficult and costly.

Plaintiffs assert that, in the absence of elevated PCB concentrations, existing facilities and buildings would have been safely usable. They contend that, had Old Monsanto adequately warned them prior to construction, they would not have used construction materials containing Old Monsanto's PCBs in their buildings. In addition, had Old Monsanto adequately warned them after construction of their buildings, they

could have removed contaminated materials sooner and avoided the need to replace
certain structures.

### C.      Effects of Exposure to PCBs.

Plaintiffs assert PCBs are "highly toxic" to humans and "[e]xposure to even small
amounts of PCBs is known to increase the risk of harm to neurological, cognitive,
endocrinal, hepatic, and other biological systems." *Id.* at 13, ¶ 6. When exposed to PCBs,
children and adolescents are particularly susceptible to adverse neurodevelopmental
impacts. PCBs, when used ordinarily and as intended, contaminate air, water, and porous
materials over time by leaching, off-gassing, and migrating from their original
applications. Construction materials containing PCBs allegedly inevitably contaminate
indoor air over time and create a "progressively more hazardous" environment. *Id.* at 13,
¶ 4. PCBs also allegedly migrate or leach from plasticizers into neighboring porous
surfaces and building materials over time.

Once PCBs leach, off-gas, or migrate from their original applications, they
allegedly remain indefinitely absent remediation and removal. Because of the health risks
associated with PCBs and the inevitable contamination associated with using construction
products containing PCBs, Plaintiffs allege PCBs are "highly inappropriate and
unreasonably dangerous for use in school building construction[.]" *Id.* at 13, ¶ 8.

### D.      Acts 74 and 78.

In 2021, the Vermont General Assembly passed Act 74, through which it
appropriated five million dollars for PCB indoor air testing in Vermont schools.[3] *See*
2021 Vt. Acts & Resolves 74, § E.709.1(a) (appropriating $4.5 million); *id.* § B.1106(3)
(appropriating $500,000) ("Act 74"). The testing requirement applies to all public schools
and recognized independent schools built or renovated before 1980. *Id.* § E.709.1(a). The

---

[3] Although this fact is omitted from the Complaint, the court can take judicial notice of state
legislative acts. *See* Fed. R. Evid. 201; *see also Pani v. Empire Blue Cross Blue Shield*, 152 F.3d
67, 75 (2d Cir. 1998) ("[A] district court may rely on matters of public record in deciding a
motion to dismiss under Rule 12(b)(6), including case law and statutes.").

current deadline for schools to complete the required testing is July 1, 2027. 2023 Vt. Acts & Resolves 78, § E.709.1(a) ("Act 78").

The Vermont Department of Health (the "VDH") has promulgated school action levels ("SALs") to indicate when schools need to identify and abate potential sources of PCBs inside their buildings. The VDH set SALs based on both the health effects associated with PCBs, as evidenced by state and federal research and guidelines, and the challenges of removing widespread PCBs. Plaintiffs assert the VDH, however, "has also emphasized that even concentrations below the SAL will cause an increased risk of cancer," and "PCB levels in the indoor air of schools should be kept as low as possible." (Doc. 1 at 14, ¶ 11.) For grades seven and higher, the SAL is 100 ng/m$^3$.

## II.    Conclusions of Law and Analysis.

### A.    Defendants' Rule 12(b)(1) Standing Challenge.

Defendants' motion to dismiss for lack of standing is treated as a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011) (internal quotation marks omitted), *aff'd*, 568 U.S. 85, 133 S. Ct. 721 (2013).

"'The party invoking federal jurisdiction bears the burden of establishing' that jurisdiction exists." *Sharkey v. Quarantillo*, 541 F.3d 75, 82-83 (2d Cir. 2008) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), "the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (citation and internal quotation marks omitted). When considering a Rule 12(b)(1) motion, "a district court . . . may refer to evidence outside the pleadings." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

5

Defendants assert numerous plaintiffs lack standing because they have not suffered an injury-in-fact. They cite website data published by the Vermont Department of Environmental Conservation (the "DEC"), the state agency responsible for coordinating the school testing, which includes both a testing schedule and test results and which reveals that seventy-six plaintiffs have either not yet tested their school buildings or have not detected PCB levels in excess of the SALs.

Documents attached to, incorporated by reference in, or "relie[d] heavily upon" for their "terms and effect[]" in a complaint are considered part of the complaint for purposes of a motion to dismiss. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks and citation omitted). The DEC's testing schedule and posted results are not incorporated by reference in the Complaint, nor does the Complaint heavily rely on their contents. The DEC testing schedule and results are thus not integral to the Complaint.

Alternatively, Defendants argue that the court may take judicial notice of the DEC testing schedule and results, which are a matter of public record. Pursuant to Fed. R. Evid. 201, a court may "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016) (taking judicial notice of Food and Drug Administration Guidance because the document "is publicly available and its accuracy cannot reasonably be questioned"). In some circumstances, the purpose of judicial notice is merely to establish certain documents exist, not to use the information therein "for the truth of the matters asserted." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (emphasis omitted) (internal quotation marks and citation omitted).

In this case, the DEC's testing schedule and results are public records contained in an official government website and are subject to judicial notice. Defendants do not concede that the testing results are accurate. The parties do, however, agree that the DEC data accurately reflects the number of school districts that have tested for PCBs.

6

Accordingly, the DEC schedule and testing results serve the limited purpose of demonstrating the number of school districts that have engaged in PCB testing. *See United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (finding district court erroneously relied on a Government Accountability Office report because, "while the district court could have taken notice of the GAO report, it should only have done so in order to determine *what* statements it contained . . . *not for the truth of the matters asserted* therein[]") (alterations adopted) (emphasis in original) (internal quotation marks and citation omitted).

"[A] Rule 12(b)(1) motion challenging subject matter jurisdiction may be either facial or fact-based." *Katz v. Donna Karan Co., LLC*, 872 F.3d 114, 119 (2d Cir. 2017) (citing *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016)). A facial challenge to standing is one "based solely on the allegations of the complaint or the complaint and exhibits attached to it[.]" *Id.* (internal quotation marks omitted). In such cases, "plaintiffs have no evidentiary burden," *id.*, and a district court's task "is to determine whether the Pleading 'allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue.'" *Carter*, 822 F.3d at 56 (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)) (alterations in original).

"[A] defendant may also 'make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the [plaintiff's p]leading.'" *Katz*, 872 F.3d at 119 (quoting *Carter*, 822 F.3d at 57) (alterations in original). In that event, a plaintiff must "come forward with evidence of [his or her] own to controvert that presented by the defendant," or he or she may "rely on the allegations in the[ P]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Id.* (quoting *Carter*, 822 F.3d at 57). In this case, Defendants' Rule 12(b)(1) motion is fact-based, because it relies on the DEC data, allowing the court to consider evidence not contained in the Complaint. Plaintiffs do not rebut Defendants' reliance on the DEC data to contest the number of school districts that have engaged in testing or have reported test results less than the SALs. As a result, Defendants have established these facts for purposes of their motion to dismiss.

7

"Article III standing consists of three 'irreducible' elements: (1) *injury-in-fact*, which is a 'concrete and particularized' harm to a 'legally protected interest'; (2) *causation* in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) *redressability*, or a non-speculative likelihood that the injury can be remedied by the requested relief." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008) (quoting *Lujan* 504 U.S. at 560-61) (emphasis in original). "It is well established in principle that the pleading standard for constitutional standing is lower than the standard for a substantive cause of action." *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 110 (2d Cir. 2018) (citing *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 222 (2d Cir. 2008)). To establish standing, "the pleader need only show that allowing [him or] her to *raise* [his or] her claim in federal court would not move so beyond the court's ken as to usurp the power of the political branches." *Id.* at 111 (emphasis in original) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).

Defendants argue that "[s]chools that do not have [PCB test] results at or above the SALs in any sample" have not suffered an injury-in-fact because they "are not required to conduct further tests or take remedial actions." (Doc. 47 at 4.) Relying on the DEC's data, Defendants allege that only seventeen of the ninety-three Plaintiff schools are proper plaintiffs because only these schools "have tested and demonstrated exceedances of the SALs in at least one sample in a school district building." (Doc. 47 at 1-2) (emphasis omitted). Defendants further assert that thirty-nine districts have not conducted any testing of their buildings and that an additional thirty-seven districts have tested at least one building but have not recorded any SAL exceedances.[4]

Plaintiffs do not offer any evidence to controvert the DEC data, nor do they argue that the data is in any way incorrect or incomplete. Instead, they assert that the alleged ubiquitousness of PCBs in construction materials at the relevant times renders the presence of PCBs in Plaintiffs' buildings highly likely, if not inevitable. Moreover, they

---

[4] At oral argument, Defendants updated these statistics as of February 27, 2024.

contend a recorded SAL exceedance is not necessary because "even concentrations below the SAL will cause an increased risk of cancer," and because "challenges of removing PCBs" means they must monitor the levels of PCBs in their buildings "to protect the health of students and employees[.]" (Doc. 23 at 14, ¶¶ 11, 12.) Accepting Plaintiffs' allegations as true, Plaintiffs have established an injury-in-fact at the pleading stage because they plausibly allege they will incur costs in testing and monitoring their buildings for PCBs; PCBs present in less than SAL exceedances remain harmful to human health; and Plaintiffs will incur expenses in removing PCBs, which may prove costly and difficult to achieve. These same facts serve to satisfy the requirements of causation and redressability as well.

For the reasons stated above, Plaintiffs have sustained their burden to establish standing at the pleading stage. *See Lujan*, 504 U.S. at 561("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice[.]"); *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003) ("[A]t the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury."). Defendants' Rule 12(b)(1) motion is DENIED.[5]

### B.     Defendants' Rule 12(b)(6) Motion to Dismiss Claims for Public Nuisance, Private Nuisance, and Trespass.

Defendants move to dismiss under Fed. R. Civ. P. 12(b)(6), which requires "a complaint [to] contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The sufficiency of a complaint is evaluated using a "two-pronged approach[.]" *Hayden v.*

---

[5] Because standing is a continuing requirement, the court must reevaluate this question as evidence becomes available during the course of the litigation. *See Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 74 (2d Cir. 2022) ("At all stages of litigation, the party invoking federal jurisdiction bears the burden of establishing the elements of Article III standing.") (internal quotation marks and citation omitted); *see also Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009) ("If subject matter jurisdiction is lacking and no party has called the matter to the court's attention, the court has the duty to dismiss the action sua sponte.").

*Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.*

The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff will prevail on his or her claims. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017). "When considering a motion to dismiss pursuant to Rule 12(b)(6), the district court . . . is required to accept as true the facts alleged in the complaint, consider those facts in the light most favorable to the plaintiff, and determine whether the complaint sets forth a plausible basis for relief." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 443 (2d Cir. 2015).

"Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Hums., Inc.*, 518 U.S. 415, 427 (1996). "Where the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity." *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994). In doing so, federal courts must "give full weight to the decisions of the state's highest court, and . . . give due regard to the decisions of the state's lower courts." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 449 (2d Cir. 2013). Federal courts may also "consider all of the resources to which the highest court of the state could look, including decisions in other jurisdictions on the same or analogous issues[.]" *Id.* (internal quotation marks and citation omitted).

### 1.    Whether to Dismiss Plaintiffs' Private Nuisance Claim.

Defendants contend Plaintiffs' private nuisance claim should be dismissed because Plaintiffs fail to allege that the nuisance arose from land owned or maintained by

Defendants or from Defendants' use of neighboring land. Plaintiffs counter that a product manufacturer can be liable for a private nuisance if it sets in motion a chain of events that leads to a substantial and unreasonable interference with Plaintiffs' use and enjoyment of their land.

Under Vermont law, "[a] private nuisance is . . . defined as a substantial and unreasonable interference with a person's interest in the use and enjoyment of land." *Jones v. Hart*, 2021 VT 61, ¶ 26, 215 Vt. 258, 272, 261 A.3d 1126, 1137. "An interference is substantial if it exceeds the customary interferences a land user suffers in an organized society, and unreasonable if the gravity of the harm outweighs the utility of the actor's conduct[.]" *Id.* (internal quotation marks and citations omitted). The Vermont Supreme Court has noted that "[t]he law of private nuisance springs from the general principle that it is the duty of every person to make a reasonable use of his own property so as to occasion no unnecessary damage or annoyance to his neighbor." *Myrick v. Peck Elec. Co.*, 2017 VT 4, ¶ 4, 204 Vt. 128, 131, 164 A.3d 658, 661 (internal quotation marks and citation omitted).

The parties agree that the Vermont Supreme Court has never considered a private nuisance claim in the context of product manufacturing, nor has it ever explicitly required private nuisance claims to originate from a defendant's use of nearby land. When dealing with gaps in Vermont's common law, the Vermont Supreme Court frequently relies on the Restatement (Second) of Torts (hereinafter "the Restatement"). *See Birchwood Land Co., Inc. v. Krizan*, 2015 VT 37, ¶ 9, 198 Vt. 420, 425, 115 A.3d 1009, 1012 ("We frequently have adopted provisions of th[e] Restatement where our law is undeveloped."). Here, the Restatement does not directly address whether a private nuisance may originate from a product rather than neighboring land. Recent Vermont

trial court decisions relying on § 834 of the Restatement[6] have allowed a private nuisance claim on this basis to proceed.

For example, in *State v. 3M Co.,* 2020 WL 13368654 (Vt. Super. Ct. May 28, 2020) (hereinafter *3M Co.*), the Vermont Superior Court considered a public nuisance claim brought by the State of Vermont against 3M based on 3M's manufacture and sale of polyfluoroalkyl substances ("PFAS") which allegedly contaminated Vermont's natural resources and property. The State did not allege 3M controlled the PFAS at the time they caused the public nuisance. *Id.* at *3. In refusing to dismiss the claim at the pleading stage, the court found that § 834 of the Restatement suggests substantial participation, rather than contemporaneous control, is what is essential to a public nuisance claim. *Id.* ("[L]anguage in the Restatement suggest[s] that a defendant may be held liable for harm that continues after that defendant's actions have ceased, and that 'substantial participation' in a chain of actions can be sufficient.") (citing Restatement (Second) of Torts § 834; *id.* cmts. d and e).

More recently, the Vermont Superior Court addressed the viability of a private nuisance claim in *State v. Monsanto Co.,* 2024 WL 2818695 (Vt. Super. Ct. May 29, 2024) (hereinafter the "*State Court Case*"). There, the defendants disputed the State of Vermont's right to assert a private nuisance claim in the absence of an exclusive possessory interest. *Id.* at *7-8. The court recognized that it was addressing an unsettled area of state law and relied on Vermont's more relaxed pleading standard to deny dismissal.[7] It did not address whether a private nuisance claim must originate from a

---

[6] Section 834 of the Restatement provides that "[o]ne is subject to liability for a nuisance caused by an activity, not only when he carries on the activity but also when he participates to a substantial extent in carrying it on." Restatement (Second) of Torts § 834 (1979). Although this language recognizes that liability attaches where a defendant substantially contributes to the creation of a condition that becomes a nuisance, it does not affirmatively require that activity to originate on property owned or used by the defendant.

[7] *See Bock v. Gold,* 2008 VT 81, ¶ 4, 184 Vt. 575, 576, 959 A.2d 990, 992 (stating dismissal "is proper only when it is beyond doubt that there exist no facts or circumstances[] consistent with the complaint that would entitle the plaintiff to relief[]"); *see also Colby v. Umbrella, Inc.,* 2008 VT 20, ¶ 5 n.1, 184 Vt. 1, 6 n.1, 955 A.2d 1082, 1086 n.1 (reaffirming Vermont's "minimal notice pleading standard" and rejecting the federal pleading standard under *Iqbal/Twombly*).

defendant's use or ownership of adjoining land, but instead focused on the requirement of substantial participation and reached the identical conclusion as the *3M Co.* court. *See id.* *7 ("[L]anguage in the Restatement suggests that a defendant may be held liable for harm that continues after that defendant's actions have ceased, and that substantial participation in a chain of actions can be sufficient.") (citing Restatement (Second) of Torts § 834 cmts. d and e).

In *Burlington Sch. Dist. v. Monsanto Co.*, 2023 WL 4175344 (D. Vt. June 26, 2023) (hereinafter *BSD*) this court considered nuisance claims in the context of product manufacturing and similarly concluded that allegations of a defendant's "substantial participation" in actions that allegedly cause a nuisance were sufficient at the motion to dismiss stage. *Id.* at *4-6. In doing so, the court relied on § 834 of the Restatement, Vermont Supreme Court decisions, and decisions from the Southern District of New York and the Second Circuit interpreting New York law. *Id.* at *5-6 (citing *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 121 (2d Cir. 2013) (upholding jury verdict based on defendant's knowledge that the "MTBE gasoline it manufactured would make its way into Queens, where it was likely to be spilled, and once spilled, would likely infiltrate the property of others."); *SUEZ Water N.Y. Inc. v. E.I. du Pont de Nemours & Co.*, 578 F. Supp. 3d 511, 548 (S.D.N.Y 2022) (ruling "substantial participation" is "satisfied when there was evidence that the defendant, having sold a toxic or dangerous substance to an identified third party, continued to sell the same product to the third party for a profit knowing that that third party would continue to use it in a manner that maintained the nuisance[]")). The *BSD* court noted that courts interpreting § 834 of the Restatement "generally reject attempts to impose a control requirement, instead focusing on whether the defendant created or participated in the creation of the nuisance." *Id.* at *6 (internal quotation marks omitted).

In predicting how the Vermont Supreme Court would rule, this court notes that Vermont law does not impose an affirmative requirement that all private nuisance claims originate on nearby land, nor does the Restatement. The court thus agrees with *BSD*'s conclusion that a defendant's substantial participation in causing the injury may suffice if

the defendant sets in motion the chain of events giving rise to the private nuisance. In their Complaint, Plaintiffs satisfy this requirement by plausibly alleging that Old Monsanto sold PCB-containing products that it knew would be used in the construction of Plaintiffs' schools, knew the harm posed by those products, and did not warn or remediate that harm but actively concealed it, thereby setting in motion the chain of events that gave rise to the alleged private nuisance. In light of this unsettled area of Vermont law, the court will await a factual record before fully assessing this novel claim. *See Mansfield Heliflight, Inc. v. Freestream Aircraft USA, Ltd.*, 2016 WL 7176586, at *14 (D. Vt. Dec. 7, 2016) ("At the pleading stage, dismissal of a novel claim without the benefit of discovery and a factual record is not warranted.") (citing *Adato v. Kagan*, 599 F.2d 1111, 1117 (2d Cir. 1979)); *see also Goldberg v. Saint-Sauveur Valley Resorts, Inc.*, 2018 WL 8370060, at *17 (D. Vt. Dec. 20, 2018) (denying motion to dismiss because, "[w]hile a novel theory of fiduciary liability, without a factual record, the court cannot hold as a matter of law that no fiduciary duty exists in these circumstances").

For the reasons stated above, Defendants' motion to dismiss Plaintiffs' private nuisance claim is DENIED.

### 2.     Whether to Dismiss Plaintiffs' Public Nuisance Claim.

In seeking dismissal of Plaintiffs' public nuisance claim, Defendants argue Plaintiffs have failed to allege an interference with a right common to the general public because they bring their claims as property owners. Defendants also again argue they lacked ownership and control of the alleged injury-causing instrument.

"[T]he concept of public nuisance is vague and amorphous[.]" *Napro Dev. Corp. v. Town of Berlin*, 376 A.2d 342, 345 (Vt. 1977). "[T]o be considered a public nuisance, an activity must disrupt the comfort and convenience of the general public by affecting some general interest." *Id.* at 346. A plaintiff must do more than note a generalized public interest but rather must explain how the nuisance "affects or has the potential to affect the general public." *State v. Howe Cleaners, Inc.*, 2010 VT 70, ¶ 50, 188 Vt. 303, 331, 9 A.3d 276, 294 (concluding State's assertion of "general public interest in protecting

groundwater[]" was insufficient to demonstrate contamination was public nuisance). In addition, to maintain a claim for public nuisance, a plaintiff must show "special damage" from the public nuisance and "it must appear that the injury is distinct from that suffered by the general public." *Sargent v. George*, 56 Vt. 627, 631 (1883). Special damage "must be different in kind and not merely in degree[.]" *Pilgrim Plywood Corp. v. Melendy*, 1 A.2d 700, 702 (Vt. 1938).

Defendants characterize Plaintiffs' property rights in this case as individual rather than communal. *See Town of Stockbridge v. State Highway Bd.*, 216 A.2d 44, 47 (Vt. 1965) (pointing out that, although building was owned by municipality, the nature of its use was such that there was "no right of access to the building by the public at large" because there was no evidence "it was open to all members of such public on an equal basis[]"); *see also Loverin v. Montpelier Cent. Sch. Dist.*, 2003 WL 25744778, at *2 (Vt. Aug. 1, 2003) (affirming no trespass order against person who harassed school employees that allowed "reasonable access to public events on school grounds during non-school hours[]"). While Plaintiffs are property owners and their buildings are not owned by the public at large, because of the nature of Plaintiffs' operations, the public has greater rights of access to those properties than it does with property owned by non-public school entities.

In Vermont, there is a general right to access public school buildings and facilities for educational purposes, as well as a general public interest in a safe educational environment. *See* Vt. Const. ch. II, § 68 ("[A] competent number of schools ought to be maintained in each town unless the general assembly permits other provisions for the convenient instruction of youth."). The Vermont Supreme Court has recognized that children's access to education is "integral to [Vermont's] constitutional form of government, and its guarantees of political and civil rights[.]" *Brigham v. State*, 692 A.2d 384, 390 (Vt. 1997); *see also Vitale v. Bellows Falls Union High Sch.*, 2023 VT 15, ¶ 11, 217 Vt. 611, 622, 293 A.3d 309, 317 ("Vermont children have a fundamental right to education under the Education Clause of the Vermont Constitution."). At this stage and without the benefit of a factual record, the court is reluctant to find as a matter of law that

15

there can be no claim for a public nuisance in a public school building when that building is owned by a school district as opposed to by the general public.

With regard to the requirement of "special damage," Plaintiffs' ownership and maintenance of school facilities and buildings and their responsibility for remediating the alleged PCB contamination serves as an injury that is different in kind and not merely in degree from the injury suffered by the general public. *See Howe Cleaners, Inc.*, 2010 VT 70, ¶ 50, 188 Vt. at 331, 9 A.3d at 294. In addition, Plaintiffs have duties and responsibilities to safeguard the health and well-being of schoolchildren that the general public does not. Plaintiffs have therefore plausibly alleged "special damage."

To the extent Defendants reiterate their argument that Plaintiffs' claim must fail because they do not allege Defendants controlled the PCBs at the time the public nuisance arose, Plaintiffs have the better part of the argument at the pleading stage because they have plausibly alleged that Old Monsanto knew that its products containing PCBs would find their way into Plaintiffs' schools and yet allegedly chose not to warn of but instead concealed the dangers inherent in those products.

Because the Vermont Supreme Court has not affirmatively required that a defendant maintain control over the injury-causing instrumentality for a public nuisance damages claim,[8] and because Vermont's trial courts are split on this issue,[9] and because

---

[8] Vermont law requires continuing control in a nuisance claim where a plaintiff seeks injunctive relief. *See State v. Massey*, 47 A. 834, 837 (Vt. 1900) (ruling in the context of a request for an injunction in a nuisance case, "[i]f the injunction is against the keeper only, it should operate only upon such rooms as are in his occupancy or under his control, and it should issue against such persons only as have power to control the tenement and abate the nuisance, though others may have an interest in the building[]"). Where a party seeks damages rather than an injunction, it is not clear whether this requirement remains.

[9] *Compare State v. Purdue Pharma L.P.*, 2019 WL 13274415, at *3 (Vt. Super. Ct. Mar. 19, 2019) (declining to dismiss claim that marketing of opioids thus causing mass addiction and societal issues constituted "public nuisance") *and State v. 3M Co.*, 2020 WL 13368654, at *3 (Vt. Sup. Ct. May 28, 2020) (denying motion to dismiss public nuisance claim where manufacturers allegedly placed product in stream of commerce knowing it would eventually contaminate state resources and property and impact human health) *with State v. Atl. Richfield Co.*, 2018 WL 11358617, at *10 (Vt. Super. Ct. July 31, 2018) (dismissing public nuisance claim that was "essentially a products liability claim").

courts in other states that have considered this question are similarly divided,[10] the court will not dismiss this claim at this nascent phase of the case. This approach is consistent with *BSD*, 2023 WL 4175344, at *6 ("The allegations against Monsanto, yet unproven, describe or infer substantial participation in conduct that was harmful, intentional, and unreasonable. Such conduct has been held sufficient for a nuisance claim.") and the *State Court Case*, 2024 WL 2818695, at *7 (stating that pleading sole control by the defendant was not required for a public nuisance claim because "language in the Restatement suggests that a defendant may be held liable for harm that continues after that defendant's actions have ceased, and that substantial participation in a chain of actions can be sufficient") (citing Restatement (Second) of Torts § 834 cmts (d) and (e)). The court therefore predicts that the Vermont Supreme Court would likewise hold that lack of control of the injury-causing instrumentality is not dispositive but merely one factor to consider in adjudicating a public nuisance claim.

Because Plaintiffs have plausibly alleged a public nuisance claim, Defendants' motion to dismiss that claim is DENIED.

### 3.    Whether to Dismiss Plaintiffs' Trespass Claim.

Defendants argue Plaintiffs have failed to plausibly allege the essential elements of trespass under Vermont law: (1) unauthorized intrusion; (2) entry onto land of another; and (3) invasion of tangible matter. *Nesti v. Vt. Agency of Transp.*, 2023 VT 1, ¶ 24, 217

---

[10] *Compare Tioga Pub. Sch. Dist. No. 15 v. U.S. Gypsum Co.*, 984 F.2d 915, 920 (8th Cir. 1993) (noting what it observed to be a general trend in concluding that "nuisance law does not afford a remedy against the manufacturer of an asbestos-containing product to an owner whose building has been contaminated by asbestos following the installation of that product in the building" because the "liability for damage caused by a nuisance turns on whether the defendant is in control of the instrumentality alleged to constitute a nuisance") *with City of Chi. v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1132 (Ill. 2004) (explaining that "[w]hen the nuisance results from a condition or conduct upon land, control over the land is generally a necessary prerequisite to the imposition of liability. However, when the nuisance results from the use or misuse of an object apart from land, or from conduct unrelated to a defendant's use of land, lack of control of the instrumentality at the time of injury is not an absolute bar to liability[]").

Vt. 423, 434, 296 A.3d 729, 738; *John Larkin, Inc. v. Marceau*, 2008 VT 61, ¶ 9, 184 Vt. 207, 211, 959 A.2d 551, 554.

"Liability for trespass arises when one intentionally enters or causes a thing to enter the land of another." *Canton v. Graniteville Fire Dist. No. 4*, 762 A.2d 808, 810 (Vt. 2000) (citing Restatement (Second) of Torts § 158(a) (1965)). The Vermont Supreme Court has acknowledged the "accepted distinction that trespass is an invasion of the plaintiff's interest in the exclusive possession of his land, while nuisance is an interference with his use and enjoyment of it." *Marceau*, 2008 VT 61, ¶ 8, 184 Vt. at 210, 959 A.2d at 553 (internal quotation marks and citation omitted). "A person who intentionally enters or remains upon land in the possession of another without a privilege to do so is subject to liability for trespass." *Jones*, 2021 VT 61, ¶ 66, 215 Vt. at 287, 261 A.3d at 1147 (internal quotation marks omitted).

In seeking dismissal of Plaintiffs' trespass claim, Defendants argue that Plaintiffs consented to Old Monsanto's products entering their facilities and schools when they or someone acting on their behalf purchased those products and permitted them to be used during construction. At least one court has concluded that a plaintiff who voluntarily purchases products that contaminate the plaintiff's buildings cannot thereafter sustain an action for trespass. *See City of Manchester v. Nat'l Gypsum Co.*, 637 F. Supp. 646, 656 (D.R.I. 1986) (dismissing trespass claim "because the plaintiff was the one placing the asbestos products in the schools and other public buildings[]").

The Restatement recognizes that "consent to conduct of another is effective for all consequences of the conduct and for the invasion of any interests resulting from it[,]" unless "the person consenting to the conduct of another is induced to consent by a substantial mistake concerning the nature of the invasion of his interests or the extent of the harm to be expected from it and the mistake is known to the other or is induced by the other's misrepresentation[.]" Restatement (Second) of Torts § 892B (1979); *see also id.* § 167 (stating § 892B applies to "entry or remaining on land[]"). Plaintiffs have plausibly alleged Old Monsanto knowingly sold PCB-containing products that were unsafe, knew those products were likely to be used in constructing Plaintiffs' schools, and concealed

18

the fact that its products were harmful. Accepting Plaintiffs' allegations as true, they have plausibly alleged they did not consent to the PCB contamination because they were misled regarding the toxicity of PCBs and thus Defendants' invasion was unauthorized.

Vermont law is less clear in defining "tangible matter" in the context of a trespass claim. The traditional view is that "the intrusion of smoke, gas, noise, or other invisible particles onto another's property is not actionable as a trespass, but only as a private nuisance." *Marceau*, 2008 VT 61, ¶ 10, 184 Vt. at 211, 959 A.2d at 554. Some courts have "adopted a so-called 'modern' theory of trespass that permits actions based on the invasion of intangible airborne particulates." *Id.* at ¶ 11, 184 Vt. at 212, 959 A.2d at 554. "Under this modern theory, invasions of intangible matter are actionable in trespass only if they cause substantial damage to the plaintiff's property, sufficient to be considered an infringement on the plaintiff's right to exclusive possession of the property." *Id.* (citing *Mock v. Potlatch Corp.*, 786 F. Supp. 1545, 1550-51 (D. Idaho 1992)).

Acknowledging that Vermont law is silent on this issue, and that the Restatement does not definitively answer the question, the Vermont Supreme Court has expressly declined to answer "whether the intrusion of airborne particulates may ever be a trespass, and, if so, what impact is required to sustain such an action."[11] *Id.* at ¶ 14, 184 Vt. at 213, 959 A.2d at 555. The court was particularly reluctant to extend trespass to actions based on "the physical entry onto land of intangible airborne particulates" absent any allegations of physical property damage. *Id.* at ¶ 14, 184 Vt. at 213, 959 A.2d at 555; *see also Paris v. Lussier*, 2010 WL 7791942, at *3 (Vt. July 16, 2010) (dismissing trespass claim based on smoke entering plaintiffs' land because "plaintiffs focused on the effect that the smoke allegedly had on their physical health, making no mention of any 'demonstrated physical impact on [their] *property* resulting from the airborne

---

[11] The Vermont Supreme Court acknowledged that "[t]he Restatement does note, however, that [actions in trespass and in nuisance] are not necessarily exclusive and may overlap." *John Larkin, Inc. v. Marceau*, 2008 VT 61, ¶ 13, 184 Vt. 207, 213, 959 A.2d 551, 555 (citing Restatement (Second) of Torts § 821D cmt. e).

particulates.'") (citing *Marceau*, 2008 VT 61, ¶ 15, 184 Vt. at 213-14, 959 A.2d at 555)
(alterations and emphasis in original). The *Marceau* court explained:

> We recognize that the dispersion of airborne particles, whatever their
> nature, may technically be considered an entry onto land creating liability
> for trespass irrespective of whether any damage was caused. Because the
> ambient environment always contains particulate matter from many
> sources, such a technical reading of trespass would subject countless
> persons and entities to automatic liability for trespass absent any
> demonstrated injury. Plainly, that cannot be the law—and, as far as we can
> tell, no jurisdiction has so held. The question, then, is whether the physical
> entry onto land of intangible airborne particulates can ever be a trespass, or
> whether such an invasion may be actionable only as a nuisance. Because
> [the plaintiff] has failed to demonstrate any impact on its property from [the
> defendant's] pesticides, we find it unnecessary in this case to adopt a hard-
> line position that the dispersion of airborne particulates on property may
> never be actionable as a trespass, irrespective of the nature of the invasion
> or the right invaded. We leave for another day the question of whether the
> intrusion of airborne particulates may ever be a trespass, and, if so, what
> impact is required to sustain such an action.
>
>                                   \* \* \*
>
> Here, absent a demonstrated physical impact on [the plaintiff's] property
> resulting from the airborne particulates, the superior court did not err in
> granting summary judgment to [the defendant]. When particles enter the
> ambient environment without any demonstrated impact on the land, we fail
> to see how a trespass has occurred. In such a case, there is no ouster from
> the land, as [the plaintiff] claims here, and no interference with the
> landowner's right to exclusive possession of the land. Hence, under such
> circumstances, the landowner has no action in trespass. In a traditional
> trespass action, the right to exclusive possession of property may not
> depend on an analysis of the impact on the use of the land, but we cannot
> presume an intrusion on that right in situations where the plaintiff fails to
> show that an intangible invasion of airborne particulates had a
> demonstrated physical impact.

*Marceau*, 2008 VT 61, ¶ 14-15, 184 Vt. at 213-14, 959 A.2d at 555-56.

In dismissing trespass claims based on the invasion of intangible particles, the
Vermont Supreme Court has emphasized the plaintiffs' failure to allege significant
property damage resulting from the invasion. In contrast, Plaintiffs allege that Old
Monsanto's PCB-containing materials are the cause of "contamination and property
damage now found in the [Plaintiffs'] properties, namely the [Plaintiffs'] campus

facilities[.]" (Doc. 112 at 45, ¶ 141.) Because of this contamination, Plaintiffs contend the "invasion constitutes a significant physical impact on the [Plaintiffs'] schools' facilities—so significant that the buildings must be remediated and/or replaced." *Id.* at 53, ¶ 189. Although a close question, accepting Plaintiffs' allegations as true, they plausibly allege property damage so severe that it will require, in some instances, demolition and replacement of entire buildings. They have therefore plausibly alleged an unauthorized intrusion onto their land by Defendants based upon particulates that have caused "substantial damage to the [P]laintiff's property[.]" *Marceau*, 2008 VT 61, ¶ 11, 184 Vt. at 212, 959 A.2d at 554. Because the Vermont Supreme Court has not explicitly foreclosed a claim of trespass on this basis, Defendants' motion to dismiss Plaintiffs' trespass claim is DENIED.

## III.  Conclusion.

For the reasons stated above, Defendants' motion to dismiss for lack of standing is DENIED (Doc. 47); and Defendants' motion to dismiss Plaintiffs' claims for public nuisance (Count I), private nuisance (Count II), and trespass (Count V) is DENIED (Doc. 47).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _30th_ day of September, 2024.

Christina Reiss, Chief District Judge
United States District Court

21